**In re the Marriage of Saveen KONDAMURI, Appellant–Petitioner,**

v.

**Jayasri KONDAMURI, Appellee–Respondent.**

**No. 45A03–0510–CV–523.**

Court of Appeals of Indiana.

Aug. 17, 2006.

---

Debra Lynch–Dubovich, Levy & Dubovich, Highland, IN, Attorney for Appellant.

Kathryn D. Schmidt, Burke Costanza & Cuppy, LLP, Merrillville, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Saveen Kondamuri ("Father") appeals the trial court's order dissolving his marriage to Jayasri Kondamuri ("Mother").

We affirm in part, reverse in part and remand with instructions.

### ISSUES

1. Whether the trial court properly awarded custody of the parties' daughter, A.K., to Mother.
2. Whether the trial court abused its discretion in determining child support.
3. Whether the trial court abused its discretion when it found that Father dissipated marital assets.
4. Whether the trial court abused its discretion in awarding attorney fees to Mother.

### FACTS

Father was born and reared in the Chicago area. Mother was born and reared in India. Both Father and Mother attended and graduated from medical school in India. Father and Mother met shortly before their arranged marriage, which took place on November 8, 1993. Mother moved to the United States in "May or June" of 1994. (Father's App. 70). Father was in a residency program, earning approximately $35,000 per year. Father finished his residency in 1996 and began practice as an anesthesiologist. Despite several attempts, Mother could not pass the exams necessary to continue her medical education.

A.K. was born on December 12, 1998. At the time, Father and Mother were living in and around the Chicago area. Father was working approximately twelve hours per day at a surgical center, and Mother began volunteering at the University of Illinois in Chicago, doing research work. Mother hoped her volunteer work would lead to a residency.

In the summer of 1999, when A.K. was approximately nine-months old, Mother moved to Boston to do research work at Harvard as a volunteer. Mother moved to Boston because her sister had a residency there and could assist Mother in finding a position. Mother testified that Father encouraged her to move to Boston to pursue her medical career. Although Mother testified that she wanted to take A.K. to Boston with her, Father and A.K. remained in Illinois.

Mother finally obtained a surgical residency in Boston in June of 2000, which paid approximately $35,000. Mother repeated another year as a surgical resident in Boston and then signed a contract to do another year of residency in internal medicine, also in Boston. Mother remained in Boston until December of 2002. During her stay in Boston, Mother saw A.K. six or seven times.

In September of 2001, Father rented an apartment in Schererville, Indiana. In August of 2002, Father filed for dissolution in Indiana. Subsequently, Mother retained counsel in Illinois and filed for dissolution in Illinois. Mother filed a motion to dismiss the Indiana dissolution case, arguing

the trial court lacked jurisdiction. The trial court granted the motion to dismiss. Father appealed the dismissal, and we affirmed the trial court. *See Kondamuri v. Kondamuri,* 799 N.E.2d 1153 (Ind.Ct.App. 2003). The Illinois proceeding was dismissed around December of 2003.

Father again filed a petition for dissolution of marriage on December 10, 2003, in Indiana. Mother consented to the jurisdiction of the Indiana court. On December 31, 2003, the trial court entered a provisional order, giving Father temporary custody of A.K., allotting Mother "reasonable visitation upon reasonable notice using as a minimum the Indiana Parenting Time Guidelines," awarding Mother temporary maintenance in the amount of $1,000 per week and attorney fees in the amount of $5,000, and appointing a guardian ad litem ("GAL") and a custody evaluator. (Father's App. 28)

The trial court held a final hearing on August 15 through August 19, 2005. Father requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. The parties stipulated to joint legal custody. On September 22, 2005, the trial court entered its decree of dissolution. The trial court awarded physical custody of A.K. to Mother. The trial court "impute[d] full time minimum wage to the Mother for calculation of child support." (Father's App. 16). Finding that Father "reduced his work hours and was voluntarily underemployed as he assumed some of the child care responsibilities which the paternal grandparents had been previously providing" in 2004, the trial court used Father's "2003 income in the amount of $338,124.00 for purposes of calculation of child support." (Father's App. 17).

The trial court further found that "Father dissipated marital assets as seen by the gambling losses he claimed on his tax returns." (Father's App. 18). Thus, the trial court ordered the marital assets be divided with sixty percent going to Mother. The trial court also ordered Father to "be responsible for $4,500.00 in attorney fees the Mother has incurred herein," and reduced to a judgment against Father the amount of $39,916.00 in attorney fees incurred by Mother in the previous dissolution actions. (Father's App. 20). Additional facts will follow as necessary.

### DECISION

When a party has requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Wenzel v. Hopper & Galliher, P.C.,* 779 N.E.2d 30, 36 (Ind.Ct.App.2002), *trans. denied.* In reviewing the judgment, we first must determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* The judgment will be reversed if it is clearly erroneous. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.* Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Nienaber v. Nienaber,* 787 N.E.2d 450, 454 (Ind.Ct.App.2003).

### 1. Custody

Father contends that "the trial court should have utilized the more-stringent

custody-modification standard, instead of the less-stringent initial custody-determination standard." Father's Br. at 11. Father further contends that even if the trial court utilized the proper standard, "the trial court still erred in awarding custody to the Mother." Father's Br. at 19.

### a. Determination of Custody Standard

Father argues that the trial court should have used the custody modification standard instead of the initial custody determination standard. Father argues the trial court should have used the modification standard because "Mother did nothing but acquiesce to the Father having custody." Father's Br. at 16.

 In an initial custody determination, both parents are presumed equally entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating that the existing custody should be altered. *Apter v. Ross*, 781 N.E.2d 744, 757–58 (Ind.Ct.App.2003), *trans. denied.* Accordingly, the petitioner must show "a change in circumstances so decisive in nature as to make a change in custody necessary for the welfare of the child." *In re Paternity of Winkler*, 725 N.E.2d 124, 127 (Ind.Ct.App.2000). "A stricter rationale is required to support a change in custody because 'permanence and stability are considered best for the welfare and happiness of the child.'" *Id.* (quoting *Lamb v. Wenning*, 600 N.E.2d 96, 97 (Ind.1992)).

Father relies on *Winkler* and *Hughes v. Rogusta*, 830 N.E.2d 898 (Ind.Ct.App. 2005), to support his contention that the trial court should not have used the less strict custody-determination standard because Mother acquiesced to Father's custody of A.K., and therefore, Father provided A.K. with permanency and stability. We believe the facts of these cases are distinguishable from the one at hand.

In *Winkler*, the mother always had legal custody of the parties' child, and the child had lived with the mother ten out of the child's twelve years when the father filed a petition to establish paternity and custody. We found that although there was no legal initial custody determination, the custody modification standard was appropriate because the interest in the child's stability still applied as the father had long acquiesced to the mother's physical custody of the child. 725 N.E.2d at 128. In *Hughes*, this court found no acquiescence where there was no prior court determination concerning custody, and the father immediately filed to establish paternity and determine custody after the mother moved out of the family residence with the child. 830 N.E.2d at 901.

In this case, there was no initial custody determination. Furthermore, although Mother lived apart from Father and A.K. for approximately three years, we cannot say that she acquiesced to Father's custody. Rather, Mother's stay in Boston, while A.K. remained with Father in Illinois, was a mutually agreed upon arrangement whereby Mother could pursue her medical career, and then once that was established, return to Illinois. Although Mother's contact with A.K. was limited while Mother resided in Boston, she resumed extended contact with A.K. once she moved back to Illinois. Thus, we find the trial court did not err in applying the initial determination of custody standard.

### b. Award of Custody to Mother

 Father asserts that even if the trial court properly applied the initial determination of custody standard, "the trial court still erred in awarding custody to the Mother." Father's Br. at 19. A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their

conduct and demeanor and hears their testimony. *Trost–Steffen v. Steffen*, 772 N.E.2d 500, 509 (Ind.Ct.App.2002), *trans. denied.* Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses or substitute our judgment for that of the trial court. *Id.* We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. *Id.*

Regarding the determination of initial custody in a dissolution proceeding,[1] Indiana Code section 31–17–2–8 provides as follows:

The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Father argues that the evidence does not support the trial court's findings and the findings do not support the judgment. Regarding the determination of custody, the decree of dissolution provides as follows:

7. [T]he Court has given due consideration to the interaction and interrelationship of the child with her parents. The Court finds that it is undisputed that the Father had physical custody of the minor child since the parties separated. However, the Court finds that this circumstance existed because the Mother, according to her upbringing and the parties' Indian customs, could not defy her [sic] Father or her in-laws. The Father took the Mother to Boston for her to begin a residency at Harvard. The Father had total control over the parties' finances and complete control over [A.K.]. The Father refused to allow [A.K.] to go to Boston with the Mother. The Court finds that the Father blocked the Mother's attempts to remain in contact with [A.K.]. For example, the Father refused to allow [A.K.] to go to India with the Mother when the maternal grandfather was terminally ill. Eventually, the Mother was denied all contact with [A.K.]. Finally in October of 2002, the Mother had to resort to police assistance to, as she describes it, "even see her daughter's face[.]"

8. The Court finds that for the past three years, and especially after the appointment of the Guardian Ad Litem in December of 2003, the Mother's parent-

---

1. The trial court cited Indiana Code section 31–14–13–2, which is the statute applicable to determining custody in paternity proceedings. The paternity and dissolution statutes, however, contain virtually identical language.

ing time has steadily increased with the Father's consent. Over the past three years, both parents have enjoyed substantial time with [A.K.]. In the recent past, the Mother's parenting time has included half of the summer, half of the school breaks, every other weekend from Friday until Monday morning and one overnight each week.

9. Both parties have been active in [A.K.'s] school and extracurricular activities.

10. The Court heard extensive evidence about the interaction and interrelationship between the child and her extended families. While the Father had custody of [A.K.], he relied on the paternal grandparents to assist with much of the child care responsibilities. During the early years of her life, [A.K.] resided in the paternal grandparents' home in Orland Park. More recently, [A.K.] is frequently at the paternal grandparents' home during the Father's weekend parenting time and she is there during all of the Father's extended parenting time. The amount of time [A.K.] actually spends at her Father's apartment is questionable. The Father had considerable economic means, yet [A.K.'s] bed does not have footboard or headboard and the Father does not have a kitchen table, only a card table, in his apartment. However, the fact that the Father has a close relationship with his family and that the paternal grandparents assist with [A.K.'s] care, is *not* [emphasis in original] a negative factor. Indeed, the Mother will need to rely on the maternal grandmother and other maternal relatives when the Mother completes her Step III medical examinations and completes her three or more years of medical residency.

11. This Court has given due consideration to the age and the sex of the child when making this physical custody determination. The child, [A.K.], was born on December 12, 1998, and is currently six and a half (6½) years old. In several years the child will enter puberty and will need a familiar and helpful mother figure in her life.

12. The Court had given due consideration to the wishes of the child when making this physical custody determination, although the wishes of the child are difficult to ascertain and are given little deference as the child is just six and a half (6½) years old. However, the custodial evaluator and the GAL report that [A.K.] loves both of her parents.

13. The Court finds that [A.K.] has a loving relationship with her paternal grandparents and other paternal relatives who reside locally. The Court finds that [A.K.] also has a loving relationship with the Mother's relatives and a few especially close family friends whom she refers to as "auntie". All of these persons have helped [A.K.] flourish. These interrelationships are important to the child and the Court finds that these interrelationships should continue to be encouraged and fostered.

14. This Court has given due consideration to the child's adjustment to the child's community when making this custody determination. There was ample evidence as to the child's successful adjustment to her school, her play groups, her involvement in extracurricular activities and her involvement in the temple.

15. This Court has given due consideration to the mental health of all individuals involved when making its physical custody determination. The custodial evaluator reports that there was a time, several years ago, when the Mother was "almost suicidal" and that the Mother had suffered from "clinical depression". This was during her forced separation from her husband and daughter. The Mother, who is a medical school gradu-

ate, denied being "suicidal" but admitted to being "very, very sad." There was no evidence presented regarding any recent or current mental health concerns involving the Mother, the Father or the child.

16. The Court appointed Dr. Gopal as the custodial evaluator in this case because Dr. Gopal is from India, and, as such, it was hoped that this particular evaluator could help the Court deal with the cultural issues which this case presented. Dr. Gopal recommended that the Mother have physical custody.

17. In her custodial evaluation, the custodial evaluator made some errors of fact which the Court finds to be of minor significant [sic] as to the ultimate issue of custody.

18. However, of significance, on page twelve of her report, Dr. Gopal describes an interview with [A.K.] as follows:

"She has been told that her mother is a 'liar' and is trying to take her away from her father. She has been told that her 'mother is a bad person' and [']I should not believe her' . . . her mother 'is a stealer and never bought me anything'. [A.K.] became uncharacteristically quiet and would not speak for a while after that engaging in a drawing as if completely engrossed in it. She longs for a mother and gets wistful when she talks about mother" . . .

"When asked if she loved her mother, she ran to the door, made sure it was closed and asked how to lock it. She then locked the door and whispered, 'I can't say it'. Based on her disclosures, she appears to believe that she is not allowed to say she loves her mother, and said that if she says 'mm' it means yes. After that, she sat on the evaluator's lap and she would either say 'mm', which means yes, or shake her head in response to other questions. When the source(s) of the negative inputs were

identified, the child was reassured that the evaluator would [not] tell anyone. She appeared visibly frighted [sic] for the first time. The subject was changed."

This troubling interview with [A.K.] occurred in March of 2004.

19. Equally troubling was the testimony of Dr. Sharma. Dr. Sharma is a close personal friend of [A.K.'s] mother who is also active in their Hindu temple. [A.K.] is so close to Dr. Sharma that she calls her "auntie" as in the Indian custom. Yet when [A.K.] was at the temple with paternal relatives she hid from her "auntie". [A.K.] was afraid to speak or even make eye contact with her "auntie." And when [A.K.] was greeted by her "auntie", she offered no response at all.

20. The Mother testified about a similar *recent* [emphasis in original] event which occurred in May of 2005. At [A.K.'s] kindergarten graduation/awards ceremony, [A.K.] appeared afraid and unable to display any affection to her Mother while she was in the presence of the Father and his family members.

21. The Guardian Ad Litem recommended that physical custody of the child remain with the Father and recommended what is tantamount to a joint physical custody parenting plan. The Court finds that the recommended plan is not in the child's best interest because it involves too much back and forth between homes especially in light of the fact that [A.K.] also spends a considerable amount of time between, not just her parents['] homes, but the homes of her paternal grandparents and other extended family members. A consistent home is especially important for a school age child. However, it is important that [A.K.] have continued involvement with both her parents and her extended sup-

port system which is primarily located near the parties' current residences.

(Father's App. 13–16). The trial court then concluded:

Taking all the statutory factors into consideration, the Court finds that [A.K.'s] ability to have a healthy relationship with her Mother is and has been jeopardized while [A.K.] was in the custody of the Father. The Court finds that [A.K.] will be best able to enjoy a healthy relationship with both of her parents if the Mother has physical custody. Therefore, the Mother is awarded physical custody so long as [A.K.] resides not more tha[n] 60 miles from her current residence in Highland, Indiana so that [A.K.] can continue to benefit from her close relationship with her Father and her extended family in this area.

(Father's App. 16).

There was extensive testimony from Father, Mother, relatives and friends in this case. The court-appointed experts presented different opinions regarding who should have physical custody of A.K., with the GAL determining that it was in A.K.'s best interest to remain with Father and the custody evaluator opining that Mother should have physical custody. Our review of the record does not support Father's contention that the findings of fact are clearly erroneous. Father is asking us to reweigh the evidence, which we will not do. Accordingly, we find no error in awarding physical custody of A.K. to Mother.[2]

**2. _Child Support_**

Father contends the trial court abused its discretion in determining child support when it imputed his 2003–income to him and imputed only the minimum wage to Mother. Father also asserts the trial court erred in refusing to order provisional child support.

 A trial court's calculation of a child support obligation under the child support guidelines is presumptively valid. _Thompson v. Thompson,_ 811 N.E.2d 888, 924 (Ind.Ct.App.2004), _trans. denied._ We review a trial court's decision to award child support for an abuse of discretion. _Id._ "An abuse of discretion occurs if the trial court's decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law." _Id._

Regarding income for child support purposes, the trial court found in relevant part:

24. The Mother's immediate plan to study for her Step III medical exam will make it difficult, if not impossible, for her to be employed. Nevertheless, the Court imputes full time minimum wage to the Mother for calculation of child support. The Court rejects the Father's request to impute $10.00 per hour to the Wife. No evidence was submitted that the [Mother] could obtain employment at $10.00 per hour, other than the Father's belief that she should be able to do so. The facts presented at trial were that the highest paying job the [Mother]

---

**2.** Father also argues that the trial court impermissibly found that "[i]n several years the child will enter puberty and will need a familiar and helpful mother figure in her life." The trial court, however, was considering A.K.'s sex and age in determining her best interest. Furthermore, although the trial court considered all the relevant facts in determining A.K.'s best interest, it appears that

it based its decision to award custody to Mother in large part on A.K.'s interaction and interrelationship with the parents and so concluded that "[A.K.] will be best able to enjoy a healthy relationship with both of her parents if the Mother has physical custody." (Father's App. 16). Thus, this finding regarding A.K.'s age and sex is superfluous to the ultimate judgment reached.

had obtain[ed] in the recent past was a part time job for $7.00/hour in a lab located a considerable distance from her home. Her employment was terminated when the lab closed. Since that time, the Mother has been working part time at Dunkin Donuts or she has been unemployed.

25. The Court finds that in 2004, the Father reduced his work hours and was voluntarily underemployed as he assumed some of the child care responsibilities which the paternal grandparents had been previously providing. Therefore, the Court uses the Father's 2003 income in the amount of $338,124.00 for purposes of calculation of child support.

26. Child support shall be $321.21 per week payable via income withholding order.

(Father's App. 16–17).

a. *Father's income*

■■■■ Father asserts the evidence does not support the trial court's finding that he was voluntarily underemployed, and the trial court erred in imputing to Father his income from 2003. Pursuant to the Indiana Child Support Guidelines, "[i]f a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income." Ind. Child Support Guideline 3(A)(3). One of the purposes for including potential income is to "discourage a parent from taking a lower paying job to avoid the payment of significant support." Child Supp. G. 3, cmt. 2c. The trial court has discretion to impute potential income to a parent if it is convinced the parent's underemployment "has been contrived for the sole purpose of evading support obligations." *Id.* at 265. There are, however, "circumstances in which a parent is unemployed or underemployed for a legitimate purpose other than avoiding child support and in those circumstances, there are no grounds for imputing income." *Lambert*

*v. Lambert,* 839 N.E.2d 708, 714 (Ind.Ct. App., 2005).

■■■■ Father introduced evidence that his regular yearly wages in 2004 were $260,462.98. Father testified that the drop in income was due to decreased insurance reimbursements, and therefore, he was "forced to take a pay cut." (Tr. 374). Father further testified his decrease in income resulted from changes at Bindel Anesthesiology, the surgical center where he works. Specifically, Father testified that "the decreases have occurred because [Bindel Anesthesiology] ha[s] acquired a new institution, [Bindel Anesthesiology] ha[s] hired more anesthesiologists, and [there are] more rooms to cover." (Tr. 435).

Regarding his hours, Father testified that his schedule is more flexible because there are more anesthesiologists in his practice. The GAL testified that Father's schedule was more flexible because "as time went on, he was able to control his scheduling and kind of be in a better position to pick and choose when he would start his cases, because he works at a surgical center; he doesn't work at a hospital." (Tr. 159). The GAL also testified that Father adjusted his schedule "so he would be available then to his daughter shortly after school." (Tr. 158).

We cannot say that Father was voluntarily underemployed. There is no evidence that Father's flexible schedule resulted in reduced income; rather, there was testimony that other factors led to Father's reduced income in 2004. Finally, Father testified that he arranged his work schedule to better accommodate A.K.'s schedule, and no evidence was presented that Father manipulated his work schedule to avoid paying child support. The trial court's finding that Father was voluntarily underemployed was against the logic and

effect of the facts and circumstances that were before it.

### b. *Mother's income*

■ Father contends the trial court erred in imputing only minimum wage to Mother. Father argues that evidence supported imputing an income of at least $10.00 per hour Mother. We agree.

Here, the trial court found Mother's "immediate plan to study for her Step III medical exam will make it difficult, if not impossible, for her to be employed." (Father's App. 16). Mother testified that she "ha[s] to take [her] Step 3 board exam, which will be given in California." (Tr. 507). Mother, however, continued, stating that she "will not even think about [her] career right now" and that she was not pursuing a residency. (Tr. 508). Mother further asserted that she did not want to take her exams "right now" and had no desire to pursue her career as a doctor. (Tr. 536). Thus, the evidence does not support the trial court's finding that studying for medical exams precludes Mother's employment.

Regarding recent employment, Mother testified that she had worked in a lab in Illinois, earning $7.00 per hour, until the lab closed in January of 2005. Mother was offered a job in Illinois but did not accept it because she wanted to spend the summer with [A.K.] and "did not want to risk parking [her] car in Illinois and having to deal with the tickets since it would be a bad record." (Tr. 511–12). Mother testified that "[r]ight now with [her] qualification[s]," she would look for "something like a $10 job, like an assistant doing history and physical under a doctor." (Tr. 537). Under the facts and circumstances of this case, we find the trial court erred in imputing only minimum wage to Mother.

Given that the trial court erred in finding Father was voluntarily underemployed, and therefore, imputed a higher income to him, and the trial court erred in imputing the minimum wage to Mother, we reverse the trial court's order and remand with instructions to enter an order modifying child support pursuant to the Indiana Child Support Guidelines, imputing to Mother income of not less than $10.00 per hour and consistent with our finding.

### c. *Provisional support*

■ Father asserts the trial court erred in refusing to order a credit for provisional child support. We disagree. In dividing marital property a trial court may not consider child support paid by one spouse under a provisional order. *Maloblocki v. Maloblocki,* 646 N.E.2d 358, 363 (Ind.Ct.App.1995). Accordingly, we find no abuse of discretion in refusing to satisfy any perceived overpayment of child support from the marital estate. *See id.*

### 3. *Dissipation of Marital Assets*

Father next contends the trial court erred in finding he had dissipated marital assets by accruing gambling losses. Thus, Father argues, the trial court erred in awarding Mother 60% of the marital estate.

■ "Our court reviews findings of dissipation in various contexts under an abuse of discretion standard." *Goodman v. Goodman,* 754 N.E.2d 595, 598 (Ind.Ct. App.2001), *reh'g denied.* Thus, "[w]e will reverse only if the trial court's judgment is clearly against the logic and effect of the facts and the reasonable inferences to be drawn from those facts." *Id.*

■ The dissipation of marital assets involves frivolous, unjustified spending of marital assets. *Id.* "The test for dissipation of marital assets is 'whether the assets were actually wasted or misused.'" *Id.* (quoting *In re Marriage of Coyle,* 671 N.E.2d 938, 943 (Ind.Ct.App.

1996)). To determine whether dissipation has occurred, we consider the following factors:

 1. Whether the expenditure benefited the marriage or was made for a purpose entirely unrelated to the marriage;

 2. The timing of the transaction;[3]

 3. Whether the expenditure was excessive or de minimis; and

 4. Whether the dissipating party intended to hide, deplete, or divert the marital asset.

*Id.*

In this case, the trial court found in pertinent part:

 31. The division of marital property is governed by the Indiana statute which creates a rebuttable presumption that an equal division of the property is just and appropriate. However, the Court finds that there is a substantial disparity in the parties' incomes, economic circumstances and earning abilities. In addition, the Father dissipated marital assets as seen by the gambling losses he claimed on his tax returns. . . . Therefore, the Court hereby orders the marital assets to be valued and divided as follows which is approximately a 60/40 split. . . .

 \* \* \*

 34. The Court finds that the Father dissipated marital assets through gambling losses. The Court finds that the evidence demonstrated each of the following factors:

 1) the Father's gambling was for a purpose entirely unrelated to the marriage;

 2) the *staggering* [emphasis in original] amount of total gambling losses in 2000, 2001 and 2002 are not remote in

effect because of the sheer amount of the losses. The gambling losses are not deemed too remote in time, again, due to the staggering amount of the total losses and in light of the credit card and tax debts which existed on the date of filing and the Father's refusal to support [Mother] during this same time frame allegedly because of her spending habits;

 3) the gambling losses were excessive; and

 4) the Father's gambling was an intentional act, and therefore, he had the intent to deplete or divert the marital money which he lost through gambling.

 35. The Court finds that the gambling involved the frivolous unjustified spending of marital assets and that the money lost was actually wasted and misused without the Mother's consent or knowledge. The extent of the gambling losses was evidenced directly by the federal tax returns and indirectly by the Father's *substantial* [emphasis in original] income yet noticeable lack of all modest assets.

(Father's App. 18–19).

 ■ Father argues that the trial court's findings are incorrect because "[a] review of [his] tax returns establish[es] . . . that there were no gambling 'losses' ". Father's Br. at 39. Specifically, Father directs us to his tax returns, showing that in 2000, he had winnings and losses in the amount of $340,551.00, and in 2001, he had winnings and losses in the amount of $137,510.00. In 2002, Father had losses in the amount of $23,400.00 and winnings in the amount of $25,400.00. Thus, Father concludes that in 2000 and 2001, he "won exactly as much as he had lost," while in

---

**3.** "[T]ransactions which occur during the breakdown of the marriage, just prior to filing a petition or during the pendency of an action, may require heightened scrutiny." *Coyle,* 671 N.E.2d at 943.

2002, he actually had a gain. Father's Br. at 40.

We note that "[g]ambling winnings are fully taxable and must be reported on [a taxpayer's] tax return." *See* http://www.irs.gov/taxtopics/tc419.html. As for gambling losses, however, "the amount of losses [a taxpayer] deduct[s] may not be more than the amount of gambling income [the taxpayer] ha[s] reported on [the taxpayer's] return." *Id.* Therefore, tax returns are not conclusive evidence that a person's losses equal their winnings.

As to Father's actual losses, we will not reweigh the evidence. Furthermore, the evidence shows that Father gambled during the three years prior to his filing for divorce and while Mother resided in Boston; thus, the trial court properly found that Father's transactions were not remote in time and were not made with Mother's knowledge. In addition, the evidence supports the trial court's finding that marital assets were diverted to gambling rather than used to pay joint debts and expenses. Accordingly, we cannot say that the trial court abused its discretion in determining that Father misused marital assets, and therefore, dissipated marital assets.

### 4. Attorney Fees

Father asserts the trial court abused its discretion in awarding attorney fees to Mother. "We review a trial court's decision to award attorney fees in connection with a dissolution decree for an abuse of discretion." *Thompson*, 811 N.E.2d at 927. When awarding attorney fees, the trial court "must consider the resources of the parties, their economic conditions, the ability of the parties to engage in gainful employment, to earn adequate income, and other factors that are pertinent to the reasonableness of the award." *Id.*

The trial court's order provides in relevant part:

37. During the marriage and immediately before filing this cause of action, the Father paid $100,000.00 in attorney fees for himself. The Court finds that said amount was paid using marital funds. During this same time frame, the Mother incurred $84,756.00 in attorney fees and said amount is still owed to her friends and relatives. The Court finds this debt to be a marital debt which shall be included as debt in the marital estate. The Court finds that the prior attorney fee issue could not have been litigated in the prior Indiana dissolution proceeding because that Court lacked jurisdiction over the particular case. The Court rejects the Father's argument that fees were, or could have been, litigated in the prior dissolution in Illinois because no evidence thereof was presented. During oral argument of counsel, statements were made that the Illinois action was dismissed by a default entry because the Mother could no longer afford to pay her attorney. However, no testimony or pleadings were submitted to establish the factors necessary to support the Father's *res judicata* argument in regards to the Illinois proceeding and attorney fees.

(Father's App. 20). The trial court then reduced $39,916.00 of Mother's pre-filing fees to a judgment against Father and in favor of Mother.

Father argues that he testified that he "had incurred other fees before this second Indiana case had been filed and that [he] had incurred additional fees in the prior Illinois action, but that those fees were not included in his Attorney Fee Affidavit." Father's Br. at 41. Father further argues that "[t]here was no evidence as to how the Father's prior attorney bills were paid or when they were paid." Father's Br. at 42.

Mother testified and presented evidence that she incurred dissolution-related fees

in the amount of $84,756.00. Father neither refutes that Mother incurred attorney fees in the amount of $84,756.00 nor that Mother had to borrow a significant amount to pay her attorney fees. Thus, the evidence supports the trial court's findings. Furthermore, under the facts and circumstances of this case, namely, Mother's lack of employment and Father's earning capabilities, the trial court's order that Father pay a portion of Mother's attorney fees was well within its discretion.

Affirmed in part, reversed in part and remanded with instructions.

RILEY, J., and VAIDIK, J., concur.