

FILED

Oct 28 2016, 5:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Julie C. Dixon
Darlene R. Seymour
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Richard A Mann
Meghan L. Gehring
Richard A Mann, P.C.
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jennifer R. Quinn,<br>*Appellant-Respondent,*<br><br>v.<br><br>Daniel P. Quinn,<br>*Appellee-Petitioner.* | October 28, 2016<br><br>Court of Appeals Case No.<br>49A02-1509-DR-1321<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable David J. Dreyer,<br>Judge<br><br>The Honorable Patrick Murphy,<br>Magistrate Judge<br><br>Trial Court Cause No.<br>49D10-1302-DR-5731 |

**Pyle, Judge.**

# Statement of the Case

In this contentious dissolution action, Jennifer R. Quinn ("Mother") argues that the trial court erred in: (1) awarding custody of the parties' son to Daniel P. Quinn ("Father"); (2) calculating child support; and (3) distributing the parties' property. Concluding that the trial court did not abuse its discretion in awarding custody of the parties' son to Father or in calculating child support, we affirm those portions of the dissolution order. However, we find that the trial court abused its discretion in distributing the parties' property because it did not include the value of all of the parties' assets in the marital pot. We therefore affirm in part, reverse in part, and remand with instructions for the trial court to redistribute the parties' property without the necessity of a hearing.

Affirmed in part, reversed in part, and remanded.

# Issues

I.      Whether the trial court abused its discretion in awarding custody of the parties' son to Father;

II.      Whether the trial court abused its discretion in calculating child support;

III.      Whether the trial court abused its discretion in distributing the parties' property;

# Facts

Mother and Father were married in 1993. The parties' daughter, C.Q. ("C.Q."), was born in 1994; their daughter, M.Q. ("M.Q."), was born in 1996;

and their son, D.Q. ("D.Q."), was born in 2002. In January 2013, Mother left her family and moved into an apartment. She apparently took out the apartment lease in Father's name without his knowledge. Two weeks later, Mother returned to the parties' home, and Father would not let her in the house. Mother called the police, who arrived at the house and told Father he would have to leave. Father explained what Mother had done, and the police officers informed Mother that it was she who would have to leave. The following day, Mother had Father served with a protective order, which apparently required him to vacate his home and prohibited him from contacting Mother.[1] Father moved into the apartment that Mother had leased in his name.

[4] In February 2013, Father filed a petition for dissolution. He subsequently learned that Mother had opened several credit card accounts and accrued substantial debt without his knowledge. Three months later, in May 2013, the parties entered into a preliminary agreement, which awarded physical custody of the children to Mother and parenting time in accordance with the parenting time guidelines to Father. Father was ordered to pay $250.00 per week in child support as well as $25.00 per week towards a $2,958.00 child support arrearage. Mother was given exclusive possession of the marital residence and ordered to pay the first mortgage and utilities. Father was ordered to pay the second mortgage as well as private school tuition for M.Q. and D.Q. In addition, each

---

[1] The protective order is not included in the appendix and was not admitted into evidence at the hearing.

party was ordered to pay one-half of the minimum monthly payment on several outstanding credit card balances.

[5] Three months later, in August 2013, Father filed a petition seeking custody of M.Q. as well as a modification of child support. A few weeks later, Mother filed a contempt petition alleging that Father had refused to pay child support as set forth in the preliminary agreement. Almost a year later, Mother filed a second petition for contempt related to the payment of M.Q.'s private school tuition. Thereafter, the pending motions were continued multiple times, both parties changed counsel, and the parties attempted mediation but did not reach an agreement. In November 2014, M.Q. voluntarily moved in with Father following her eighteenth birthday.

[6] The trial court held the dissolution hearing in January and March 2015. Before witnesses began testifying at the hearing, Mother pointed out that she had filed a request for findings of fact and conclusions pursuant to Trial Rule 52. Testimony at the hearing revealed that during the course of the marriage, Father had been the children's primary caretaker. He explained that he had gotten up early with the children to review for tests, made breakfast, taken the children to school, picked them up from school or aftercare, taken them home, fixed dinner, cleaned the house, and helped them with their homework. Father also attended the children's class parties and chaperoned their field trips. In addition, Father testified that he and D.Q. had always been especially close. Father explained that in the past, he and D.Q. had "[done] everything together," such as getting haircuts, going to the grocery store, and just

"hang[ing out." (Tr. 47). Father had coached D.Q. in every sport he had ever played since he was three years old.

[7] Father further explained that although Mother did not work when the children were young, she was too busy talking on the telephone or shopping to participate in the children's activities. She did not help the children do their homework or prepare for tests because she believed that was the "teacher's job." (Tr. 43).

[8] Father also explained that in the two years since Mother had had him served with a protective order, he had not been able to participate in the children's activities, including D.Q.'s sports, as he had in the past. For example, Father was at football practice in the summer of 2013 when the police showed up and led Father off the field past the team and their parents. He was handcuffed in the parking lot, taken to jail, and charged with invasion of privacy. Apparently Mother had shown up at the practice, and the police told Father that he should have left the practice as soon as Mother arrived. Further, in January 2015, shortly before the dissolution hearing, Father was coaching his son's basketball team when Mother walked in and told D.Q. to leave. The police walked in immediately thereafter and told Father to leave the premises. Father was told that he should have left the building as soon as he saw Mother walk in the door.

[9] Father further explained that he had observed the impact that the separation had on his son and requested custody of D.Q. Specifically, Father testified that "[[f]or the first year when I did get to see him he would sit on my lap and cry all

the time. And now --- he was with me this past weekend and he's doing better but he still cries and he always sits on my lap." (Tr. 48). Father continued that D.Q. was thirteen years old and "a big kid . . . but . . . I tuck him into bed every night I have him, he kisses me hello, he kisses me goodbye, we hug all the time. Very --- extremely close." (Tr. 48).

[10] Father asked the trial court to dismiss the protective order. He explained that he had never physically or emotionally abused Mother. Rather, according to Father, Mother had been mentally and physically abusive to both Father and the children. Father explained that he never once raised his hand to her. Instead, he turned his back and just let her hit him. Father expressed his concerns about Mother's mental health and explained that Mother "[flew] off the handle daily. She [did] whatever she [could] to keep me and my children apart." (Tr. 47).

[11] When asked why he had not previously challenged the protective order, Father explained that he had a different attorney at the time it was issued and he "was not aware [he] had any recourse. [He] was never given that advice. . . . [he] relied on his lawyer to take care of [him] and he didn't." (Tr. 77).

[12] Father also explained that he had requested additional time with the children during the pendency of the dissolution "hundreds and hundreds of times." (Tr. 37). According to Father, "I think maybe fives [sic] it was granted to me." (Tr. 37). Father further explained that he had always been flexible with Mother and granted her requests for changes in parenting time.

[13]     Father was aware that D.Q. had been diagnosed with ADHD during the pendency of the dissolution; however, Mother had not given him any additional information about his son's condition. Father had "tried to get with [D.Q.'s] doctors and psychiatrists or people that he's been with . . . [but had] never been given the information." (Tr. 128). Father explained that he was unable to attend doctor's appointments because of the protective order. The protective order also prevented Father from attending parent/teacher conferences. However, Father maintained e-mail contact with his children's teachers.

[14]     Regarding his economic circumstances, Father testified that he was an electrician and rigger for the International Alliance of Theatrical Stage Employees and that his hourly wage varied from $19.00 to $40.00, depending on the job. He submitted two child support obligation worksheets, one showing that he earned $1175.00 per week, which did not include over time, and one showing that he earned $1700.00 per week, which included overtime. Father explained that overtime was not guaranteed and that he sometimes took it to pay off specific bills. Further, according to Father, the winter months were slow because no one wanted to come to Indiana in the middle of winter to do a show. At the time of the marriage, Father had a retirement account with a value of $136,458.39. By the time of the dissolution, the account had grown to $234,956.71. Also at the time of the marriage, Father owned real estate that he subsequently sold. He used $15,000.00 of the proceeds as a down payment on the marital residence. Father also submitted a summary of his child support

payments, wherein he claimed that he was current on his $250.00 per month child support payments and had in fact overpaid child support by $809.57 as of January 16, 2015.

[15] Mother testified that she was a stay-at-home mom for the first eleven to twelve years of the parties' marriage. She went to beauty school when D.Q. was four years old and began working full-time when D.Q. started first grade. Mother had a financial interest in a nail salon from 2006 until 2013. At the time of the hearing, Mother was the office manager in an insurance office. Mother testified that: (1) she worked thirty-seven and one-half hours per week; (2) her hourly rate was $14.00; and (3) her weekly pay was $525.00. However, Mother's verified financial declaration listed her income as $577.00 per week. In addition, Mother introduced a single paystub into evidence, which showed that she had worked 82.50 hours during the pay period and that her hourly rate was $14.00, which computes to a weekly income of $577.50.

[16] According to Mother, she had been living in the marital residence during the pendency of the dissolution and was responsible for paying the utilities and the $730.00 per month first mortgage. She explained that she soon planned to move into a $900.00 a month condominium and that Father could take possession of the marital residence because she no longer wanted it. During cross-examination, Father's counsel asked Mother if she understood that she was under a court order to maintain possession of the marital residence and pay the first mortgage until the court decided otherwise. Mother responded that she

only had to make the payments until her dissolution was finalized, implying that her obligation would end that day after the final hearing.

[17] Following the final hearing and before the trial court issued its findings of fact and conclusions of law, Father filed a petition for rule to show cause in April 2015. In the petition, Father stated that pursuant to the parties' preliminary agreement, Mother received temporary exclusive possession of the marital residence and was responsible for the payment of the first mortgage and utilities. According to Father, Mother had nevertheless vacated the residence and "stripped the house of all appliances, household furnishings, the gas grill from the patio, and all light fixtures." (App. 88). Mother had left the house in "total disrepair." (App. 89). Father alleged that the house smelled of animal waste and mold. In addition, Father alleged that Mother had not paid the first mortgage in three months. Father asked the trial court to order Mother to return the appliances, find Mother in contempt, and impose all available sanctions. One month later, Mother filed an emergency petition for contempt alleging that Father had failed to pay tuition at M.Q.'s private high school. According to Mother, M.Q. would not be allowed to take final examinations the following week or graduate if Father did not pay the tuition.

[18] A few days later, the trial court held a hearing on the two petitions. Testimony at the hearing revealed that Father had immediately paid M.Q.'s high school tuition so that she would be able to take her final exams and graduate. The testimony further revealed that Mother had stopped paying the mortgage and utilities at the marital residence. She had also removed all the appliances,

including the refrigerator, stove, washer, and dryer, and placed them in the garage at her new condominium. In addition, she had removed the gas grill and light fixtures, and the house was in disrepair, both inside and out.

[19] On August 14, 2015, the trial court issued a detailed twelve-page decree of dissolution and disposition of collateral matters, which provides in relevant part as follows:

Custody of [M.Q. and D.Q.]

\*   \*   \*   \*   \*

12. Prior to separation, [Mother] voluntarily vacated the former marital residence and left all three (3) children with [Father]. She was absent approximately two (2) weeks at which time she filed a Protective Order against [Father]. She reclaimed the home and was de facto custodian.

13. In part due to the protective order, [Father] experienced difficulty getting parenting time with the children.

14. [Father] was very involved with the children's extracurricular activities, and school functions. He assisted with coaching, field trips, and class plays. [Father] was also a member of the Men's Club at the children's school.

\*   \*   \*   \*   \*

16. During the pendency of this case, [Father] has requested additional time with the children to which [Mother] consistently refused. [Mother] has requested additional time during holiday functions with the children

for Thanksgiving and Christmas, all of which [Father] agreed.

* * * * *

19. The court finds persuasive the characterization of the close relationship between [Father] and [D.Q.], and that the strain placed on that relationship and the difficult behaviors could have been ameliorated by [Mother], but were not.

20. [M.Q.] expressed her wishes by moving in with [Father] as of November 10, 2014.

* * * * *

23. [Father] reported [Mother]'s rages and uncontrollable anger. [Father] believes it is in the best interest of [M.Q.] and [D.Q.] to be placed in his physical custody subject to [Mother]'s parenting time. The court agrees, including the factor of the children being together.

24. The [court finds and concludes] that it is in the best interest of [M.Q. and D.Q.] for [Father] to receive sole physical custody.

* * * * *

Child Support

27. For the purpose of the Indiana Child Support Guidelines and the Guideline Worksheet, the Court concludes as follows:

    a. [Father] has a gross weekly income of $1,175.47. [Father] occasionally works overtime, but it is not guaranteed.

    b. [Mother] has a gross weekly income of $577.00.

c. [Father] pays a health insurance premium for the minor children in the sum of $68.60 per week.

[d.] Based upon the custody ordered herein [Mother]'s percentage share of income is 33% and [Father]'s percentage share of income is 67%.

\* \* \* \* \*

[f.] The recommended child support order is for [Mother] to pay [Father] the sum of $69.48 per week . . . .

[g.] This order results in overpayment of child support by [Father] to [Mother] . . . in the amount of $5,303.00.

\* \* \* \* \*

Marital Estate

34. Prior to the marriage, [Father] owned the following assets:

a. IATSE Local 30 Pension, 15 years prior to the date of marriage with a value of $98,498.32. (Exhibit 3).

b. Real estate that was sold and $15,000.00 of the proceeds from the sale was used as a down payment on the former marital residence.

35. [Mother] did not own any assets prior to the marriage.

36. During the marriage, [Father] and [Mother] acquired assets and debts that are subject to division by the Court. The approximate date for the valuation of the assets and debts of the parties is the date of the filing of the Petition of Dissolution on February 13, 2013. Father and Mother stipulated to the majority of the value of the assets and debits.

They are as follows:

Asset                                                                    Value

*    *    *    *    *

IATSE Local Pension (earned during the marriage) $136,458.00

*    *    *    *    *

37.  Based upon the above, the [net marital estate] (gross marital estate minus total debts) is the sum of $143,353.44.

*    *    *    *    *

43.  [N]et distribution to Husband [is] $77,405.49.  (53%).

*    *    *    *    *

45.  [N]et distribution to Wife [is] $65,947.95.  (47%).

*    *    *    *    *

47.  The former marital residence at 5804 Foolish Pleasure Lane, Indianapolis, Indiana shall be placed for sale within ten (10) days of the date of this Decree.  Until the property is sold, [Mother] is ordered to continue to maintain and pay in a timely manner the first mortgage to Chase Bank and all utilities associated with said residence, and [Father] is ordered to continue and maintain to pay in a timely manner the second mortgage . . . .  From the proceeds of the sale of the house, the first and second mortgage shall be paid as well as any outstanding taxes, insurance or liens due and owing.  Of the remaining proceeds, [Mother] shall receive the first $100,000.00 after which any remaining net equity shall be equally divided between the parties.

*    *    *    *    *

49.  As set forth herein, [Father]'s Verified Petition to Modify Custody and Child Support is hereby [Granted].

50. [Father] shall have sole physical and legal custody of [M.Q.] as of November 10, 2014. [Father's] child support shall be modified retroactive to November 14, 2014 to reflect this change of custody with each party having 1 child in his and her custody.

51. [Father] shall have sole physical and legal custody of [D.Q.] as of the date of this Decree.

52. The modification of custody to [Father] results in an overpayment of child support from [Father] to [Mother] in the amount of $5,303.00. [Father]'s child support obligation for [D.Q.] as of November 10, 2014 shall be modified and reduced from $250.00 per week to $102.98 per week. (Worksheet #1). [Mother]'s child support obligation to [Father] for [M.Q.] as of November 10, 2014 is $101.20 per week. (Worksheet #2). This results in a[n] offset of each party's child support obligation and neither party shall be required to pay child support to the other from November 10, 2014 to the date of this decree. As set forth herein, [Father] shall receive custody of [M.Q. and D.Q.], effective the 1st Friday after the date of this Decree. [Mother]'s child support obligation for both children is $69.48 per week. (Worksheet #3). . . .

53. [Mother] shall reimburse [Father] the overpayment of child support in the amount of $5,303.00 by paying $31.00 per week until re-paid in full beginning the 1st Friday following the date of this Decree.

(Mother's Br. 27-39). Mother appeals.

# Decision

Mother argues that the trial court erred in: (1) awarding custody of D.Q. to Father; (2) calculating child support; and (3) distributing the parties' property. We address each of her contentions in turn.

Where, as here, the trial court issued findings of fact and conclusions at the request of one of the parties, we apply a two-tiered standard of review. *Maddux v. Maddux*, 40 N.E.3d 971, 974 (Ind. Ct. App. 2015), *reh'g denied*. First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* The trial court's findings are controlling unless the record includes no facts to support them either directly or by inference. *Id.* Legal conclusions, however, are reviewed de novo. *Id.* at 975. We set aside a trial court's judgment only if it is clearly erroneous. *Id.* at 974. "Clear error occurs when our review of the evidence most favorable to the judgment leaves us firmly convinced that a mistake has been made." *Id.* at 974-75. We now turn to the issues in this case.

## I. Child Custody

Mother first argues that the trial court erred in awarding custody of D.Q. to Father.[2] A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. *Kondamuri v. Kondamuri,* 852 N.E.2d 939, 945-46 (Ind. Ct. App. 2006). Accordingly, on appeal, this Court does not reweigh the evidence or assess the credibility of witnesses, and we will not substitute our judgment for that of the trial court. *Id.* at 946. We will affirm the trial court's custody determination unless it is clearly against the logic and effect

---

[2] Mother does not appeal the custody of M.Q.

of the facts and circumstances or the reasonable inferences drawn therefrom. *Id.*

[24] When rendering an initial custody determination pursuant to a dissolution proceeding, there is no presumption favoring either parent. IND. CODE § 31–17–2–8. Rather, the trial court must enter a custody order in accordance with the best interests of the child. *Id.* In determining the best interests of a child, the court shall consider all relevant factors, including the following:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>> (A) home;
>>
>> (B) school; and
>>
>> (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian.

*Id*.

[25] Here, our review of the evidence reveals that Father has historically been D.Q.'s primary caretaker and that he and D.Q. are extremely close. Mother could have ameliorated the strain placed on that relationship and on her son but chose not to do so. Rather, Mother selectively enforced the protective order when Father attempted to coach D.Q. or attend his school events. Further, Father was not given information regarding D.Q.'s ADHD diagnosis. In addition, when Father requested additional parenting time, Mother rarely agreed to it even though Father had accommodated her similar requests. This evidence supports the trial court's conclusion that it is in the best interest of D.Q. for Father to receive custody. We find no abuse of the trial court's discretion.

[26] "Mother concedes that Father's request for custody at the final hearing could be supported by the facts and inferences of the record to a degree. Mother is not arguing that Father is not an appropriate custodian for D.Q. only that she is in a better position to meet his needs." (Mother's Br. 23). According to Mother, "[t]his case appears to fall in the narrow segment of cases where most of the statutory factors for making a custody decision would not come into play in meeting the children's best interests." (Mother's Br. 23). This argument is simply a request that we reweigh the evidence, which we cannot do. *See Kondamuri*, 852 N.E.2d at 946.

## II. Child Support

[27] Mother also argues that the trial court abused its discretion in calculating child support. Specifically, she argues that the trial court erred in: (1) failing to include Father's overtime pay in his gross weekly income calculation; (2) determining that Mother's weekly income was $577.00; and (3) determining that Father had overpaid child support by $5,303.00. We address each of her contentions in turn.

[28] Indiana places a strong emphasis on the discretion of our trial courts in determining issues involving child support. *Sexton v. Sexton,* 970 N.E.2d 707, 710 (Ind. Ct. App. 2012), *reh'g denied, trans. denied.* On appeal, we will not set aside a trial court's decision unless it is clearly erroneous. *Id.* We do not reweigh evidence or judge witness credibility on appeal. *Id.* Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. *Id.* Although we defer to a trial court's ability to find the facts, we do not defer to conclusions of law. *Id.* We now turn to Mother's arguments.

[29] Mother first argues that the trial court erred in failing to include Father's overtime pay in his gross weekly income calculation. Overtime compensation is includable in the total income approach taken by the guidelines. Ind.Child Support Guideline 3 (Commentary 2.b). However, the includability of overtime wages in the noncustodial parent's income is a fact sensitive matter, and it is not the intent of the guidelines to require a party who has worked

overtime to continue doing so indefinitely just to meet a support obligation based on that higher level of earnings. *Id.*

[30] Here, our review of the evidence reveals that Father's sole testimony regarding overtime compensation was that overtime was not guaranteed and that he sometimes took it to pay off specific bills. There is no evidence that Father routinely used overtime to maintain a higher level of earnings. Based on this evidence, the trial court found that Father occasionally worked overtime, but that overtime was not guaranteed and did not include it in Father's gross weekly income calculation. The evidence supports the trial court's finding, and the finding supports the trial court's decision not to include Father's overtime in his gross weekly income calculation. We find no error.

[31] Mother next argues that the trial court erred in determining that her weekly gross income was $577.00. In support of her argument, Mother points out that she testified that her weekly income was $525.00. However, the sole paystub that she submitted into evidence reveals that she worked 82.5 hours during the pay period while earning $14.00 per hour, which results in weekly pay of $577.50. Mother's argument is simply asking us to reweigh the evidence, which we cannot do. *See Sexton,* 970 N.E.2d at 710. Mother's paystub supports the trial court's determination that Mother's weekly income was $577.00, and we find no error.

[32] Lastly, Mother argues that the trial court erred in finding that Father had overpaid support to Mother by $5,303.00. Specifically, she contends that

"[t]here are no findings that cite to evidence in the Record supporting the conclusion that [Father] overpaid support by over $5,000.00." We disagree.

[33] Here, the trial court issued Trial Rule 52 findings pursuant to Mother's request. The purpose of special findings is to provide the parties and the reviewing court with the theory upon which the trial court decided the case in order that the right of review for error may be effectively preserved. *McGinley-Ellis v. Ellis*, 638 N.E.2d 1249, 1252 (Ind. 1994). Therefore, under the clear, mandatory language of Trial Rule 52, a trial judge is not free to ignore a timely, written request for special findings. Accordingly, Mother is correct that she was entitled to know the theory upon which the trial judge decided the case. However, our review of the findings of fact and conclusions reveals that Mother was so advised in the trial court's findings of fact and conclusions.

[34] Specifically, the trial court order provides in relevant part as follows:

> 52. The modification of custody to [Father] results in an overpayment of child support from [Father] to [Mother] in the amount of $5,303.00. [Father]'s child support obligation for [D.Q.] as of November 10, 2014 shall be modified and reduced from $250.00 per week to $102.98 per week. (Worksheet #1). [Mother]'s child support obligation to [Father] for [M.Q.] as of November 10, 2014 is $101.20 per week. (Worksheet #2). This results in a[n] offset of each party's child support obligation and neither party shall be required to pay child support to the other from November 10, 2014 to the date of this decree. As set forth herein, [Father] shall receive custody of [M.Q. and D.Q.], effective the 1st Friday after the date of this Decree. [Mother]'s child support obligation for both children is $69.48 per week. (Worksheet #3). . . .

(Mother's Br. 52-53).

[35]    Our review of the evidence reveals that in May 2013, Father was ordered to pay $250.00 per week in child support. At the January 2015 dissolution hearing, Father's evidence showed that Father was current on these court-ordered payments. Furthermore, Mother has never claimed that Father stopped these payments before the August 14, 2015 dissolution order. The evidence further reveals that the dissolution order modified Father's required child support payment effective November 10, 2014, the day that M.Q. left Mother's home and moved in with Father.[3] Due to this custody change, the trial court reduced Father's $250.00 weekly payment to $102.98, which is $147.02 less than what Father actually paid for nine months, or thirty six weeks, from November 10, 2014 through August 14, 2015. Thus Father overpaid approximately $5303.00 in child support.[4] This evidence supports the trial court's finding, and the finding supports the trial court's conclusion that Father overpaid child support in the amount of $5303.00. We find no error.

## III. Property Distribution

---

[3] The trial court could have ordered the modification to be effective as early as August 2014, the date that Father filed the petition to modify child support. *See Becker v. Becker*, 902 N.E.2d 818, 820 (Ind. 2009) (holding that a trial court has discretion to make a modification of child support relate back to the date the petition to modify is filed, or any date thereafter). Here, the trial court selected the date that M.Q. actually moved in with Father.

[4] $147.02 x 36 weeks = $5292.72.

[36] Mother also argues that the trial court erred in distributing the parties' property. Although she raises several challenges to the distribution, only one is dispositive. That issue is whether the trial court improperly failed to include the value of all of the parties' property, including Father's entire pension and the marital residence, in the net marital estate for distribution.

[37] It is well-settled that in a dissolution action, all marital property goes into the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse in his or her own right, or acquired by their joint efforts. IND. CODE § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App. 2014), *trans. denied*. For purposes of dissolution, property means "all the assets of either party or both parties." I.C. § 31-9-2-98. "The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines that value before endeavoring to divide the property." *Montgomery v. Faust*, 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). Indiana's "one-pot" theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award. *Falatovics*, 15 N.E.3d at 110. Although the trial court may decide to award a particular asset solely to one spouse as part of its just and reasonable property division, it must first include the asset in its consideration of the marital estate to be divided. *Id.* The systematic exclusion of any marital asset from the marital pot is erroneous. *Id.*

[38] In *Falatovics*, the trial court excluded the husband's interest in two parcels of real estate from the marital estate. On appeal, we concluded that the interest

should have been included in the marital pot. *Id.* at 111. Further, we explained that although INDIANA CODE § 31-15-7-5 creates a rebuttable presumption that an equal division of the marital property between the parties is just and reasonable, an equal division may not be just and reasonable based on a proper consideration of all the factors set forth in the statute. *Id.* at 111-12. We therefore remanded the case with instructions for the trial court to include the husband's interest in the real estate parcels in the marital pot and to redistribute the marital assets as it deemed appropriate. *Id.* at 112.

[39] Here, Father had a $234,956.32 pension plan at the time of the dissolution-$98,498.32 was earned before the marriage and $136,458.00 was earned during the marriage. The trial court included the $136,458.00 in the net marital estate, which was valued and distributed to the parties. However, although the trial court's order mentioned that the $98,498.32 portion of the pension earned before the marriage was part of the marital estate, the trial court did not include that amount when it listed the pension asset and valuation in the net marital estate for distribution. Thus, here, as in *Falatovics*, the trial court failed to include the total value of Father's pension in the net marital estate for distribution.

[40] Similarly, although the trial court mentioned the marital residence in the dissolution order, the court failed to list the marital residence as an asset or to include the value of the residence in the net marital estate. Further, although the trial court listed the second mortgage on the residence as a debt of the

marital estate and then ordered Father to be responsible for that debt, the trial court failed to list the first mortgage as a debt or to assign it to either party.

[41] Accordingly, the trial court erred in failing to include all property in the marital pot. We therefore reverse that portion of the trial court's order valuing the marital estate and remand with instructions for the trial court to: (1) include the total value of Father's pension and the marital residence in the marital pot; (2) redistribute the assets and debts as deemed appropriate; and (3) enter findings that either an equal division of the pension is just and reasonable under the circumstances or, alternatively, that the presumption of equal division has been rebutted by evidence which could include that a portion of the pension was earned by Father before the parties' marriage, and thus an equal division would not be just and reasonable. The trial court is instructed to recalculate the division of marital assets accordingly without the necessity of a hearing. *See Kendrick v. Kendrick*, 44 N.E.3d 721, 729 (Ind. Ct. App. 2015), *trans. denied,* (remanding the case to the trial court with instructions to include in the marital pot that portion of the husband's pension earned before the marriage without the necessity of a hearing).

[42] Affirmed in part, reversed in part, and remanded with instructions.

[43] Kirsch, J., and Riley, J., concur.