**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 18 2014, 8:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**TERESA K. HOLLANDSWORTH**
**R. BRIAN WOODWARD**
Woodward & Blaskovich, LLP
Merrillville, Indiana

ATTORNEY FOR APPELLEE:

**DOUG A. BERNACCHI**
Michigan City, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| MONICA S. YOLDASH n/k/a MONICA S. ORTA, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1308-DR-324 |
| | ) | |
| IBRAHIM E. YOLDASH, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE LAKE CIRCUIT COURT
The Honorable George C. Paras, Judge
Cause No. 45C01-0907-DR-574

**July 18, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Petitioner, Monica S. Yoldash (Monica), appeals the trial court's Dissolution Decree, dissolving her marriage to Appellee-Respondent, Ibrahim E. Yoldash (Ibrahim).

We affirm.

## ISSUES

Monica raises three issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by denying Monica's motion for a change of judge;

(2) Whether the trial court erred by granting custody of the parties' minor child to Ibrahim; and

(3) Whether the trial court abused its discretion in its division of the marital estate.

## FACTS AND PROCEDURAL HISTORY

Ibrahim and Monica were married on June 6, 1998. For a year-and-a-half, Ibrahim and Monica lived with Monica's parents in Mexico, where she was born. Throughout the remainder of their marriage, they lived in Merrillville, Lake County, Indiana. Ibrahim is an adjunct professor at Indiana University Northwest in Gary, Indiana, and Monica teaches parenting skills through the Early Head Start program in Plymouth, Indiana.

By their eighth anniversary, Ibrahim and Monica were experiencing marital problems. Despite their discord and Ibrahim's unwillingness to bring a child into an unstable marriage, Monica desired a baby. On January 29, 2007, Monica gave birth to the parties' only child together, a daughter, S.Y. (Child). The parties agree that for the first

three months of the Child's life, Monica was the primary caregiver. Thereafter, there is very little consensus between Ibrahim and Monica regarding any issues involving the Child. As Monica explained, Ibrahim had no interest in helping with their newborn baby; following the expiration of her maternity leave, Monica took the Child to work with her and hired a babysitter for a few months. Then, when the Child was about nine months old, Monica quit her job to be a stay-at-home mom. In stark contrast, Ibrahim asserts that he has been the Child's primary caregiver ever since Monica returned to work. Because he teaches only a few classes each week, Ibrahim explained that his family members assisted with the Child's care when needed.

On December 5, 2007, Ibrahim drove Monica and their ten-month-old Child to the airport so that she could take the Child to see her family in Mexico for the holidays. Several weeks later, Ibrahim discovered Monica's flight itinerary in their joint email account, which revealed that Monica did not plan to return to Indiana for four months. Monica maintained phone contact with Ibrahim while in Mexico, but Ibrahim became concerned when Monica indicated her intent to remain there with the Child. After also finding applications for the Child's long-form birth certificate and for Mexican nationalization, Ibrahim contacted the Center for Missing and Exploited Children. Monica returned with the Child voluntarily on March 26, 2008.

On January 21, 2009, Ibrahim filed a petition for a protective order, alleging that Monica had, on several occasions, thrown various objects at him, even when he had been holding the Child, and that she had threatened his life. Ibrahim also explained that he was requesting the protective order based on Monica's repeated threats to take the Child to

3

Mexico. The trial court denied his petition. However, five days later, Ibrahim filed a similar petition with a different court in Lake County. On the Child's second birthday, this trial court issued the protective order to Ibrahim, which required Monica to immediately vacate the marital residence and leave the Child with Ibrahim.

Following Monica's removal from the marital residence, she saw the Child several times per week at the home of Ibrahim's mother. Eventually, Monica moved to Chicago, Illinois, to live with her boyfriend, Timothy (Timothy). Monica drove back and forth from Chicago several times per week in order to see the Child. After six months of separation, on July 23, 2009, Monica filed a petition to dissolve the marriage.

On August 20, 2009, the trial court referred the parties to the Domestic Relations Counseling Bureau, and at a hearing on August 28, 2009, the parties informed the trial court that they had reached an agreement regarding provisional matters. On September 25, 2009, the trial court adopted the parties' Provisional Order, which provided that Ibrahim and Monica would share joint legal custody of the Child, with Ibrahim having primary physical custody. The parties agreed that Ibrahim would retain the marital residence, and Monica would have non-overnight parenting time with the Child three days per week. Also pursuant to the Provisional Order, Ibrahim dismissed the protective order in force against Monica.

On October 14, 2009, less than a month after its issuance, Ibrahim filed a motion to modify the Provisional Order. In support of his motion, Ibrahim argued that Timothy always accompanied Monica for her parenting time, which was confusing to the Child; that Timothy had threatened him; and that Monica's perpetual tardiness in picking up the Child

4

was causing him to be late for work. The trial court appointed a guardian *ad litem* (GAL) on December 3, 2009, but before the trial court could conduct a hearing on Ibrahim's motion, Ibrahim filed an emergency petition on December 14, 2009, to suspend Monica's parenting time. In his emergency petition, Ibrahim alleged that the Child stated that Timothy had touched her genital area. Ibrahim took the Child to the emergency room, and the Child repeated her allegations to hospital personnel. A physical exam revealed abrasions on the Child's labia, but there was no evidence of penetration and the abrasions were insufficient to substantiate the molestation.

In response to the allegation, Monica and Timothy contacted the Illinois Department of Children and Family Services and reported that the Child had recanted her statement against Timothy. Additionally, Monica submitted a video-recording in which the Child made similar accusations against Ibrahim. In the video, Monica is heard prompting the Child into stating "that [Ibrahim] hit her and pointed to her vaginal area. 'And with what'? And her answer was, 'With his little body[.]'" (Transcript p. 587). The Indiana Department of Child Services (DCS) investigated, and the Child denied that Ibrahim had ever harmed her, instead explaining that Monica had instructed her to say those things. In light of both parties' unsubstantiated claims, DCS warned Ibrahim and Monica that the Child would be taken into DCS custody if they did not cease making unfounded accusations.

After a hearing on December 29, 2009, the trial court adopted the GAL's recommendation that Ibrahim should have primary physical custody, with Monica having supervised parenting time. Timothy was ordered to have no contact with the Child.

5

Ibrahim's brother and sister-in-law (the Yoldashes) agreed to supervise Monica's parenting time in their home. Thus, Monica moved from Chicago into the Yoldashes' home in Hebron, Indiana. Initially, Ibrahim transported the Child to and from the Yoldashes' home for Monica's parenting time, but as the hostility increased between the parties—to the point that both Ibrahim and Monica were video-recording their meetings—the parties began exchanging the Child at the Valparaiso Police Department. Ibrahim believed that Monica and the Yoldashes were allowing Timothy to be present in the house with the Child, and on January 20, 2010, Ibrahim raised this complaint in yet another emergency petition to modify Monica's parenting time. He argued that the Yoldashes had become biased against him and should no longer be permitted to supervise Monica's parenting time. Regardless, by March of 2010, Monica's relationship with the Yoldashes had also become strained, and she moved out of their home and into a women's shelter in Valparaiso, Indiana. Three months later, she relocated to a transitional home for women who are victims of domestic abuse (Phoenix House), where she was still living at the time of the final hearing. On March 11, 2010, the GAL filed a motion for both parents to receive psychological evaluations.

After moving out of the Yoldashes' home, Monica had no place to conduct her parenting time, and on April 22, 2010, she filed an emergency petition to modify the Provisional Order. The trial court set a hearing on the matter for June, and on May 20, 2010, the parties submitted a proposed agreed-upon order in which Monica and the Child would participate in joint counseling with Michelle Rogowski (Rogowski). On June 18, 2010, the trial court instructed Monica to attend two additional counseling sessions after

6

which, and contingent upon Rogowski's recommendation, she could begin having unsupervised parenting time in accordance with the Indiana Parenting Time Guidelines (Guidelines). Monica attended the requisite counseling sessions; however, in a letter to the GAL, Rogowski advised that Monica should continue with supervised visitation based on her concerns that the Child "was distressed in her mother's presence" and that Monica asked the Child leading questions to prompt the Child into saying that Ibrahim had harmed her. (Tr. p. 595). Subsequent to Rogowski's letter, Monica did not see the Child again for more than a year. Each party blamed the other for this substantial gap, with Ibrahim arguing that Monica repeatedly cancelled visits or failed to arrange for supervision and with Monica claiming that Ibrahim obstructed her access to the Child.

On December 29, 2010, Monica filed a petition to modify the Provisional Order, a petition for rule to show cause, and a request for an emergency hearing. On April 12, 2011, with no action having been taken on her prior motions, Monica filed a verified petition for an injunction and requested a temporary restraining order to prohibit Ibrahim from interfering with her parenting time. In an interim order issued on May 18, 2011, the trial court ordered that Monica's parenting time be supervised through the Children's Tree House, Inc. in Crown Point, Indiana. In accordance with the trial court's instructions, Monica subsequently retained a new therapist for the Child, and she completed four supervised visits at the Children's Tree House. On June 22, 2011, Monica had her first unsupervised parenting time with the Child in more than a year-and-a-half. Two days later, Monica was scheduled to have her first overnight/weekend parenting time. When the parties arrived at the agreed-upon exchange point—the Lake County Courthouse—to

exchange the Child, a field agent with the United States Department of State Diplomatic Security Service was also there, ostensibly to investigate a complaint filed by Ibrahim about his fear that Monica would abscond to Mexico with the Child. This issue was eventually resolved with the surrender of the Child's passport.

Following her scheduled parenting time on June 30, 2011, Monica returned the Child to Ibrahim at the Valparaiso Police Department. After Monica drove away, Ibrahim requested to speak with a police officer about his concern that Monica had abused the Child. Officer Brian Babczak (Officer Babczak) interviewed the Child, who stated that Monica had not done anything to hurt her. Officer Babczak observed that the Child had a "playful demeanor" and "didn't see any marks or bruises or torn clothing, anything that would indicate child abuse." (Tr. p. 317). Ibrahim informed Officer Babczak that he did not want to have a police report on record because of the ongoing custody dispute.

On July 8, 2011, the trial court conducted an evidentiary hearing on Monica's motion to modify the Provisional Order, during which the GAL strongly urged that temporary custody be modified in Monica's favor. The trial court found that Monica had "demonstrated facts justifying a dramatic and complete revision of the [P]rovisional [O]rder." (Appellant's Exh. 23, p. 169). Based on its finding "that [Ibrahim] has, in fact, engaged in a pattern of conduct that designed, at least for this fourteen-month period, to prevent and [obfuscate] parenting time—really, not just parenting time, but any kind of conduct [between] [Monica] and this [C]hild—and would seemingly use any and every basis to do that[,]" the trial court temporarily awarded sole legal and physical custody to Monica. (Appellant's Exh. 23, pp. 169-70). Ibrahim was instructed to execute his

supervised parenting time at the Children's Tree House. In addition, the trial court ordered Dr. Jill Miller (Dr. Miller) to conduct a brief focused assessment and enjoined both Ibrahim and Monica from communicating with the Child about the other parent. On October 13, 2011, Dr. Miller filed her brief focused assessment and recommended that Ibrahim continue to have supervised parenting time. On October 14, 2011, the trial court appointed Dr. Marguerite Rebesco (Dr. Rebesco) to complete a custody evaluation.

On October 26, 2011, an anonymous caller reported to the DCS that Monica was physically and verbally abusing the Child. The informant claimed that Monica had threatened to kill Ibrahim as a consequence of the Child's bad behavior; that Monica "pulls and tears [the Child's] vagina"; that Monica videotapes the Child as she cries and forces her to state that Ibrahim hurts her; that Monica threatens the Child with needles and sticks them in her arms; that Monica pulls the Child's hair; that Monica smashes the Child's fingers with food cans; and that Monica screams in the Child's face until the Child pees her pants. (Appellant's Exh. 15, p. 2). Once again, DCS investigated and concluded that the anonymous allegations were unsubstantiated.

Up until the end of 2011, a magistrate on the Lake County Circuit Court handled all of the preliminary proceedings. However, at a hearing on November 11, 2011, the parties explained that the final hearing would require at least three days. As a result, the magistrate transferred the case to the trial court judge. Prior to the magistrate's transfer of the case, Father's girlfriend, Lisa (Lisa), sent a letter to the trial court, which was personally addressed to the trial court judge. In her letter, Lisa informed the trial court that they "share a mutual friend" and that she was writing the letter based on "her belief that you are a very

9

fair and honest man." (Appellant's App. p. 42). From there, Lisa went into significant detail about her views on Monica's deceit and abuse of the Child, the errors and bias of the magistrate and the GAL, and the injustices that Ibrahim had suffered. In closing, Lisa requested that the trial court judge consider the case for himself

> with a fair and unbiased opinion and get rid of people who are bringing your court system down, while using friendships to decide what is best for this [C]hild. Please feel free to contact [our mutual friend] to confirm these statements as truths. I am using your friendship to have an unbiased opinion and fairness brought forth in a very unjustified case full of untruths.

(Appellant's App. p. 44). Based, in part, on Lisa's letter, Monica filed a Motion for a Change of Venue from the Judge on January 31, 2012. Ibrahim filed his objection thereto one week later. On February 12, 2012, the trial court conducted a hearing and, finding no "appearance of impropriety," denied Monica's motion for change of judge. (Appellant's App. p. 83).

As the case slowly progressed, Monica gave birth to a daughter fathered by Timothy. On May 22, 2012, Ibrahim filed a voluntary petition for Chapter 7 bankruptcy; his debts were discharged on September 4, 2012. On May 25, 2012, the trial court modified Ibrahim's parenting time to unsupervised, non-overnight visits with the Child, and eventually Monica began permitting Ibrahim to exercise standard parenting time in accordance with the Guidelines. On October 11, 2012, Monica filed a petition in a neighboring county for a protective order, alleging that Ibrahim had been stalking her. In support of her petition, Monica cited, in part, Ibrahim's communication with the Child's school, that she saw Lisa's vehicle in the next highway lane after the parties had exchanged the Child, and that Ibrahim had hidden a recording device inside the Child's teddy bear.

10

The next day, the *ex parte* protection order was issued and made effective until October 12, 2014.

A five-day final hearing commenced on March 25, 2013. During his case-in-chief, Ibrahim requested that the trial court conduct an *in camera* interview with the then-six-year-old Child. At the close of the evidence on April 3, 2013, the trial court took the matter under advisement. On July 2, 2013, nearly four years after Monica filed for divorce, the trial court issued its Dissolution Decree. In specific findings of fact and conclusions thereon, the trial court awarded the parties joint legal custody of the Child, with Ibrahim receiving primary physical custody. Monica received parenting time in accordance with the Guidelines and was ordered to pay $57.59 in weekly child support. Also, after calculating the assets and liabilities of the parties, the trial court concluded that each party should receive an equitable share of the marital estate.

Monica now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Change of Judge*

Monica claims that the trial court abused its discretion by denying her Verified Motion for Change of Venue from Judge. During a pre-trial hearing, Monica clarified that she was "not accusing the [c]ourt of any wrongdoing." (Appellant's App. p. 8). Nonetheless, referencing Ibrahim's apparent attempt to disqualify the magistrate by hiring the Lake County Circuit Court Probate Commissioner as his attorney and Lisa's letter to the trial court, Monica contends that the trial court "should have venued the case to another judge . . . in order to avoid the appearance of any impropriety." (Appellant's Br. p. 15).

11

Ibrahim, however, asserts that the trial court was not required to recuse itself as Monica failed to demonstrate actual bias.[1]

A trial court has sound discretion in ruling on a motion for a change of judge, and we will reverse the trial court's decision only for an abuse of that discretion. *Carter v. Knox Cnty. Office of Family & Children*, 761 N.E.2d 431, 434 (Ind. Ct. App. 2001). It is an abuse of discretion if the trial court's ruling "is against the logic and effect of the facts and circumstances before it." *In re Guardianship of Hickman*, 805 N.E.2d 808, 814 (Ind. Ct. App. 2004), *trans. denied*. Regarding a trial court's denial of a motion for a change of venue from judge, we will find an abuse of discretion only where the "record discloses actual bias and prejudice against a party." *Carter*, 761 N.E.2d at 434. "In ruling on a motion for change of judge, the trial court must determine whether the facts alleged . . . support a rational inference of bias or prejudice." *Morris v. Bank One, Ind., N.A.*, 789 N.E.2d 68, 73 (Ind. Ct. App. 2003), *trans. denied*.

We first note that, although Monica does not specifically reference the Indiana Code of Judicial Conduct, it is clear that her argument regarding the trial court's purported dereliction of its duty "to avoid the appearance of any impropriety" is grounded in Canon 1 thereof. (Appellant's Br. p. 15). As our court has previously clarified, "because the Indiana Supreme Court has exclusive jurisdiction over alleged violations of the Code of Judicial Conduct, we cannot determine whether a trial court judge violated a Judicial

---

[1] The parties do not contest that Monica's motion was filed after the thirty-day deadline prescribed in Indiana Trial Rule 76(C)(1) for an automatic change of judge in a case where responsive pleadings are not required. *See* Ind. Code § 31-15-2-9. As such, Indiana Trial Rule 76(C)(6), which requires a verified motion setting forth, in part, the specific grounds for a change of judge, governs Monica's motion.

Canon." *In re Guardianship of Hickman*, 805 N.E.2d at 814-15. Rather, when reviewing a recusal ruling, we act under the presumption that the trial judge is neither biased nor prejudiced. *Carter*, 761 N.E.2d at 435. The moving party bears the burden of overcoming this presumption by demonstrating "actual personal bias against that party." *In re Adoption of L.C.*, 650 N.E.2d 726, 734 (Ind. Ct. App. 1995), *reh'g denied, trans. denied, cert. denied*, 517 U.S. 1136 (1996).

> Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before him. Adverse rulings and findings by the trial judge do not constitute bias per se. Instead, prejudice must be shown by the judge's trial conduct; it cannot be inferred from his subjective views.

*Carter*, 761 N.E.2d at 435 (internal citations omitted).

First, Monica contends that the trial court should have disqualified itself because Ibrahim hired the Probate Commissioner as his attorney in September of 2011 and simultaneously filed a motion for a change of judge. However, Ibrahim's motion was rendered moot when Monica objected and the Probate Commissioner withdrew as his counsel the following month. Monica argues that this was Ibrahim's "dirty little trick to try to" have the case tried before the trial court judge rather than the magistrate. (Appellant's App. p. 76). Despite Monica's assumption of such, there is no evidence that Ibrahim hired the Probate Commissioner with the intent to create a conflict of interest with the presiding magistrate. Moreover, the fact that Ibrahim unilaterally retained the Probate Commissioner, whatever his motive in so doing, while the case was still before the magistrate in no way evinces any conduct *by the trial court judge* from which bias or prejudice against Monica may be inferred.

Second, Monica contends that Lisa's correspondence to the trial court, which stated "that they shared a mutual friend who could verify the veracity of her correspondence" and which "made several other poisoning accusations[,]" contributed to the trial court's bias because Ibrahim "was rewarded by having the [ma]agistrate removed from the case and transferring the case to the [c]ircuit [c]ourt [j]udge to whom the ex parte communication was directed." (Appellant's Br. pp. 14-15). The record reveals that, before the case was transferred from the magistrate, the trial court received an unsolicited letter from Ibrahim's girlfriend, Lisa. The trial court explained,

> The letter came to me; I didn't even read it. I took it right down[] because you all were in the hearing. The exact moment I got the letter, it was brought down here and . . . [the magistrate] distributed the letter to you. I never even read the letter. So I mean, we're bound by certain rules, and the rules when we do get pro se letters from pro se litigants, or any letter involved in a case, our duty is to turn it over to the lawyers, don't even consider it. And that's exactly what we did. That could have happened if you were in any court.

(Appellant's App. p. 83).

The fact that Lisa unilaterally decided to send the trial court a highly inappropriate letter cannot be attributed to prejudicial conduct on the part of the trial court judge. "Indiana courts credit judges with the ability to remain objective notwithstanding their having been exposed to information which might tend to prejudice lay persons." *Carter*, 761 N.E.2d at 435. The trial court informed the parties that it did not read the letter, and there is absolutely no evidence to suggest that the trial court was swayed by the letter or otherwise acted upon it to the detriment of Monica. Although Monica attempts to infer prejudice based on the fact that Ibrahim ultimately succeeded in his quest to have the case transferred from the magistrate, the evidence reveals that the case was transferred due to

scheduling constraints. "A mere allegation of bias, without a specific factual showing in support, is insufficient to require disqualification." *Moore v. Liggins*, 685 N.E.2d 57, 63 (Ind. Ct. App. 1997). Therefore, we conclude that the trial court did not abuse its discretion by denying Monica's motion for a change of judge.

## II. *Dissolution Decree*

### A. *Standard of Review*

At the parties' request, the trial court issued specific findings of fact and conclusions thereon. Thus, pursuant to Indiana Trial Rule 52(A), we will not set aside the trial court's "findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." On review, we must determine whether there is evidence to support the findings and whether the findings support the judgment. *D.B. v. M.B.V.*, 913 N.E.2d 1271, 1274 (Ind. Ct. App. 2009), *reh'g denied*. We do not reweigh evidence or assess witness credibility, and we view the evidence in a light most favorable to the judgment. *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). Findings are clearly erroneous if the record is devoid of facts and reasonable inferences to support them. *Id.* We will find a judgment to be clearly erroneous if, after reviewing the record, we are left "with a firm conviction that a mistake has been made." *D.B.*, 913 N.E.2d at 1274. In addition to the standard of review set forth in Indiana Trial Rule 52, there is a longstanding preference in family law matters that the trial court's determinations are entitled considerable deference. *Swadner v. Swadner*, 897 N.E.2d 966, 971 (Ind. Ct. App. 2008). By virtue of their "unique, direct interactions with the parties face-to-face, over an extended period of time[,]" trial courts are in a better position than

15

appellate courts "to assess credibility and character through both factual testimony and intuitive discernment." *Best*, 941 N.E.2d at 502.

## B. *Custody*

Monica claims that the trial court clearly erred by awarding physical custody of the Child to Ibrahim because there is insufficient evidence to support the findings that "form the basis of the trial court's conclusions." (Appellant's Br. p. 20). In particular, Monica challenges the trial court's findings regarding: (1) the Child's allegations against Timothy; (2) Monica's stalking accusation against Ibrahim; and (3) Monica's claim that she is a victim of domestic abuse. In response, Ibrahim simply contends that Monica's argument amounts to a request of our court to reweigh the evidence.

In making an initial determination about a child's custody, there is no presumption in favor of either parent. Ind. Code § 31-17-2-8. The trial court must base its decision on the best interests of the child. To evaluate a child's best interests, the trial court must "consider all relevant factors," including:

(1)    The age and sex of the child.
(2)    The wishes of the child's parent or parents.
(3)    The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4)    The interaction and interrelationship of the child with:
    (A)    the child's parent or parents;
    (B)    the child's sibling; and
    (C)    any other person who may significantly affect the child's best interests.
(5)    The child's adjustment to the child's:
    (A)    home;
    (B)    school; and
    (C)    community.
(6)    The mental and physical health of all individuals involved.
(7)    Evidence of a pattern of domestic or family violence by either parent.

16

(8)     Evidence that the child has been cared for by a de facto custodian . . .

I.C. § 31-17-2-8. Although the trial court is required to consider the statutorily enumerated factors, any other relevant facts and circumstances before the trial court should also be taken into account in making a best interests determination. *Russell v. Russell*, 682 N.E.2d 513, 515 (Ind. 1997).

Monica first argues that the record does not support the trial court's finding "that the [C]hild had been consistent about inappropriate touching after relating the same to [Ibrahim], Dr. Rebesco, and other counselors, therapists, and investigators." (Appellant's Br. p. 18). Rather, Monica contends that "[t]here is absolutely no evidence in the record that [the Child] ever related any allegations to anyone other than [Ibrahim]." (Appellant's Br. p. 19). We disagree. The record reflects that, in addition to Ibrahim, the Child repeated her allegations about Timothy to hospital personnel during her examination. Furthermore, Dr. Rebesco spent time with the Child in the course of her custodial evaluation and testified that the Child "tends to say consistent things about a lot of the world." (Tr. p. 648).

Monica now adds that "[i]t is absolutely beyond comprehension that a [two-year-old] child would unilaterally without provocation make an allegation that she was inappropriately touched without prompting and coaching[,]" but we find this argument diametrically contradicts her prior statement to the Illinois authorities that the Child stated to her, "[Timothy] didn't touch my vagina." (Appellant's Br. p. 19; Tr. p. 585). In addition, the GAL testified that the Child has always, even at a young age, "used the word vagina" and "been reported to make references to things of a sexual nature[,]" and the Child reported to her therapist, Rogowski, that she had seen Monica and Timothy naked in their

17

room and was worried that Timothy "was being mean to her mom." (Tr. pp. 370-71). Based on all of this evidence, we find no error in the trial court's finding.

Second, Monica disputes that there is evidence to support the trial court's finding that she "made false accusations of stalking." (Appellant's App. p. 22). Again, we disagree. We find Monica's argument to be a mischaracterization of the trial court's finding, which discusses Dr. Rebesco's opinion "that [Monica] manipulates the facts to get her way[,]" and that Dr. Rebesco cited false accusations of stalking as an example of how "Monica puts on an act to make others believe she is a victim [of abuse]." (Appellant's App. p. 22). During the final hearing, Dr. Rebesco testified

> that Monica's portrayal of Ibrahim's allegedly abusive actions have greatly expanded during the provisional period. She now describes him as one who stalks, destroys property and is generally threatening to her safety. In public, Monica behaves as if she fears Ibrahim. She shows this behavior to [the Child]. Still, there is no evidence of any abusive behavior on Ibrahim's part.

(Tr. p. 636). It is clear that the trial court considered this information relevant in its assessment of Monica's credibility, and because it is supported by the evidence, we find no error in this finding.

Third, Monica challenges the trial court's finding that she "has been living in subsidized housing for abuse victims for two years based on her allegations of being victimized." (Appellant's App. p. 22). We find this to be factually accurate; however, Monica argues that it is "unclear exactly how this finding plays into the [c]ourt's decision." (Appellant's Br. p. 20). Accordingly, we reiterate the trial court's statutory obligation to consider both the mental and physical health of the parties and any history of abuse in determining the Child's best interests. I.C. § 31-17-2-8(6)-(7). This is only one of several

18

findings reflecting the trial court's consideration of these factors. In addition, the court found that "[b]oth parties have filed petitions for protective orders against one another, and have alleged domestic violence and abuse. The [c]ourt however finds that both parties have inflated these claims greatly and that neither is a victim of domestic abuse." (Appellant's App. p. 21).

Monica assails the trial court for apparently failing to "consider 'emotional abuse' as the type of abuse from which women should be protected." (Appellant's Br. p. 20). Monica reported to Dr. Rebesco that, although Ibrahim was never physically violent, he abused her psychologically by failing to provide adequate financial support, refusing to disclose his earnings, discouraging interaction with her family and friends, disagreeing with her on marital issues, and infidelity. After moving out of the Yoldashes' home, Monica moved into a women's shelter and was subsequently accepted into the Phoenix House, which provides subsidized housing for women who are victims of domestic violence, psychological abuse, sexual assault, or stalking. A Phoenix House case manager testified that Monica has "been a model client" and, due to her compliance with the program's criteria, is able to remain in the Phoenix House for as long as there is no waitlist. (Tr. p. 304).

As part of her custodial evaluation, Dr. Rebesco performed psychological testing on the parties. She testified that Monica is "driven to pursue security[,]" and the Phoenix House provided her with resources of this nature. (Tr. p. 647). To this end, Dr. Rebesco described that Monica is "willing to push the envelope" in terms of "getting what she believes that she needs to maintain a secure life[,]" including that she "perpetuated[] and

19

amplified[] her position as a victim of abuse, and has accepted resources set aside for . . . those individuals" and that she "deceived the [c]ourt in terms of her relationship with [Timothy] in order to protect his status in her life . . . as a provider for her and their child together." (Tr. pp. 646-48). Therefore, we find no clear error as the trial court's finding is supported by the record.

Finally, Monica contends that, in "[a]pplying the statutory factors, [she] [is] overwhelmingly and unerringly the parent to whom physical custody should be granted." (Appellant's Br. p. 20). Although she raises no argument regarding the trial court's failure to consider any specific factor in determining the Child's best interests, she references *Russell v. Russell*, 682 N.E.2d at 515, in which our supreme court found an abuse of discretion based on the trial court's failure to consider all of the relevant factors in its decision to award custody to the child's father. We find the present case to be sufficiently distinct. Contrary to *Russell*, where the trial court disregarded the recommendations of both the guardian *ad litem* and the court-appointed psychologist, here, there is evidence to support the trial court's decision. *See id.* Among all of the other testimony and documents presented, the trial court considered the differing opinions of the court-appointed experts, with the GAL recommending that Monica receive physical custody and the custody evaluator, Dr. Rebesco, determining that the Child's best interests would be better served if Ibrahim were awarded custody. Ultimately, after aptly noting that neither Ibrahim nor Monica "is an exemplary model of parenthood[,]" the trial court found that the evidence favoring Ibrahim as the custodial parent outweighs the evidence favorable to Monica. (Appellant's App. p. 23). It is not the role of this court to reweigh the evidence or assess

the credibility of witnesses. *See Kondamuri v. Kondamuri*, 852 N.E.2d 939, 949 (Ind. Ct. App. 2006). Because there is ample evidence on which the trial court could reasonably have based its findings, we cannot say that the trial court's decision to award custody of the Child to Ibrahim is clearly erroneous.

## C. *Marital Estate*

Lastly, Monica claims that the trial court abused its discretion in its division of the marital estate. Specifically, Monica asserts that because the debt assigned to Ibrahim had been discharged through his Chapter 7 bankruptcy, the trial court effectuated an unequal division of the marital pot. In turn, Ibrahim contends that he should not be held "responsible for half of [Monica's] debt because she chose not to file for bankruptcy." (Appellee's Br. p. 4).

The division of marital property is a matter within the trial court's sound discretion, and we will uphold the trial court's judgment absent an abuse of that discretion. *Smith v. Smith*, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010). "Even if the facts and reasonable inferences might allow us to reach a conclusion different than did the trial court, we will not substitute our judgment for that of the trial court unless its decision is clearly against the logic and effect of the facts and circumstances before it." *Perkins v. Harding*, 836 N.E.2d 295, 299 (Ind. Ct. App. 2005). We do not reweigh evidence or judge the credibility of witnesses, and we consider only the evidence most favorable to the trial court's decision. *Id.*

In a dissolution action, the division of the marital estate is a two-step process: first, the trial court must determine what property to include in the marital estate; second, the

trial court must divide the property between the spouses. *Estudillo v. Estudillo*, 956 N.E.2d 1084, 1090 (Ind. Ct. App. 2011). Indiana law provides that "all marital property goes into the marital pot for division." *Smith*, 938 N.E.2d at 860. Marital property consists of all assets and liabilities of the parties, whether

> (1) owned by either spouse before the marriage;
> (2) acquired by either spouse in his or her own right:
>    (A) after the marriage; and
>    (B) before the final separation of the parties; or
> (3) acquired by their joint efforts.

I.C. § 31-15-7-4(a); *Smith*, 938 N.E.2d at 860. The trial court is tasked with dividing the marital pot "in a just and reasonable manner" and "has no authority to exclude or set aside marital property." I.C. § 31-15-7-4; *Smith*, 938 N.E.2d at 860. In dividing the marital estate, the trial court acts under a presumption, albeit a rebuttable one, "that an equal division of the marital property between the parties is just and reasonable." I.C. § 31-15-7-5.

After calculating the various marital assets and allocating them between the parties, the trial court made the following findings:

> 60. The parties have various debts outstanding from the marriage, and that said debts should be assigned equitably between the parties by the [c]ourt.
>
> 61. Other than the aforementioned home improvement lien on the marital real estate, [which is to be paid from the proceeds of the sale of the marital residence,] the following debts of the marriage are still outstanding:
>    a. Best Buy [account,] in [Monica's] name, balance $482[;]
>    b. American Express card ending in 3001, in [Monica's] name, balance $538[;]
>    c. Discover [c]ard, in [Monica's] name, balance $1,238[;]

22

d. American Express card ending in 2004, in [Monica's] name, balance $28[;]

e. Citibank Bronze card, in [Monica's] name, balance $140[;]

f. Capital One card #9333, in [Ibrahim's] name, balance $734[;]

g. American Express ending in 0593, in [Ibrahim's] name, balance $148[;]

h. Capital One card #7515, in [Ibrahim's] name, balance $958[;]

i. Citibank card #8969[,] in [Ibrahim's] name, balance $4,012[;]

j. Citibank card #2476, in [Ibrahim's] name, balance $6,119[;]

k. Credit Management card #8233[,] in [Ibrahim's] name, balance $669[;]

l. Discover card #4870, in [Ibrahim's] name, balance $2,090[;]

m. [Ibrahim's] debt to Indiana Department of Revenue[;]

n. [Ibrahim's] debt to U.S. Internal Revenue Service[;]

o. Municollofam account #5846, balance $223[;]

p. WFNNB/Harlem account #0196, [Ibrahim's] debt, not a debt of the marriage.

62. [Ibrahim] filed Chapter 7 bankruptcy while this action was pending and discharged approximately $26,000 in debts in [his] name.

63. [Monica] should assume and be responsible for the following of the parties' debts and shall hold [Ibrahim] harmless therefrom:
a. Best Buy account[,] in [Monica's] name, balance $482[;]
b. American Express card ending in 3001, in [Monica's] name, balance $538[;]
c. Discover [c]ard, in [Monica's] name, balance $1,238[;]
d. American Express card ending in 2004, in [Monica's] name, balance $28[;]
e. Citibank Bronze card, in [Monica's] name, balance $140[;]
f. any and all debts incurred by [Monica] individual while this action was pending.

64. [Ibrahim] should assume and be responsible for the following of the parties' debts to the extent they have not been discharged in bankruptcy, and shall hold [Monica] harmless therefrom:
a. Capital One card #9333, in [Ibrahim's] name, balance $734[;]
b. American Express ending in 0593, in [Ibrahim's] name, balance $148[;]
c. Capital One card #7515, in [Ibrahim's] name, balance $958[;]
d. Citibank card #8969[,] in [Ibrahim's] name, balance $4,012[;]
e. Citibank Card #2476[,] in [Ibrahim's] name, balance $6,119[;]

23

f. Credit Management card #8233[,] in [Ibrahim's] name, balance $669[;]
g. Discover card #4870, in [Ibrahim's] name, balance $2,090[;]
h. [Ibrahim's] debt to Indiana Department of Revenue[;]
i. [Ibrahim's] debt to U.S. Internal Revenue Service[;]
j. Municollofam account #5846, balance $223[;]
k. WFNNB/Harlem account #0196, [Ibrahim's] debt, not a debt of the marriage[;]
l. any and all debts incurred by [Ibrahim] individually while this action was pending.

(Appellant's App. pp. 26-28). The trial court thus allocated $2,426 of the marital debt to Monica and nearly $14,000 to Ibrahim.[2] However, with the exception of his Capital One card having a balance of $734, Ibrahim testified that all other debts solely in his name were discharged prior to the final hearing.[3]

Our case law is clear that "the determinative date when identifying marital property subject to division is the date of final separation, in other words, the date the petition for dissolution was filed." *Granzow v. Granzow*, 855 N.E.2d 680, 683 (Ind. Ct. App. 2006). Because the marital estate is "closed" as of the filing date, any property or debts acquired thereafter may not be calculated and divided as part of the marital pot. *Deckard v. Deckard*,

---

[2] The trial court found that Ibrahim "discharged approximately $26,000 in debts in [his] name." (Appellant's App. p. 27). Ibrahim's bankruptcy schedule identifies $26,143 in unsecured debt, exclusive of the unknown amounts owed to the Internal Revenue Service and the Indiana Department of Revenue. Although not an issue raised by either party, we note that Ibrahim acquired $9,273 of this debt *after* the petition for dissolution had been filed: $958 for the Capital One card ending in 7515; $2,315 for the WFNNB/Harlem account; and $6,000 for the GAL's fees. As these liabilities may not be considered marital property, only $13,261 of Ibrahim's *discharged* debt is attributable to the marriage (the trial court also inexplicably excluded Ibrahim's $3,609 debt for a credit card obtained prior to the marriage). *See Thompson v. Thompson*, 811 N.E.2d 888, 913 (Ind. Ct. App. 2005), *reh'g denied, trans. denied*.

[3] During the final hearing, Ibrahim testified that he procured the Capital One credit card ending in 9333, with a balance of $734, *after* his bankruptcy; his attorney stipulated to the fact that it should not have been included in the list of marital debts. Even though the trial court advised the parties to redact the debt from Ibrahim's Exhibit J "[s]o it doesn't inadvertently get entered in there[,]" the liability was improperly included in the marital pot. (Tr. pp. 802-03).

841 N.E.2d 194, 201 (Ind. Ct. App. 2006). Furthermore, although all assets and liabilities must be included in the marital pot, the valuation of marital property is a matter within the discretion of the trial court. *Frazier v. Frazier*, 737 N.E.2d 1220, 1225 (Ind. Ct. App. 2000). Here, Ibrahim did not file for bankruptcy until May 22, 2012, and his debt was not discharged until September 4, 2012. Thus, as of the July 23, 2009 filing date, the majority of Ibrahim's now-discharged debt was a marital liability subject to equitable division.

According to Monica, however, "[d]ue to federal supremacy laws, the trial court was prohibited from dividing the debt in question." (Appellant's Br. p. 21). We find Monica's argument to be misplaced. The United States Bankruptcy Code establishes the extent to which a spouse's debts to or on behalf of his or her former spouse, such as an order to pay a property settlement or for a support order, are dischargeable in bankruptcy. *See Frazier*, 737 N.E.2d at 1223-24. In the present case, the discharge-ability of Ibrahim's debts is not at issue. *See In re Hill*, 133 B.R. 126, 133-36 (N.D. Ind. 1989). Instead, we must determine whether Ibrahim's debt, which was acquired prior to the parties' final separation but discharged thereafter, should have been included in the marital pot based on its value at the time the marital estate closed or excluded as a non-existent debt at the time of the final hearing.

Our court has previously determined that a trial court may consider a spouse's payments on marital debt made during the pendency of the dissolution. *Ellis v. Ellis*, 730 N.E.2d 201, 205 (Ind. Ct. App. 2000). While a bankruptcy discharge is not the equivalent of paying off one's debt, the party's liability is nevertheless purged. *See Thompson*, 811 N.E.2d at 910 ("A bankruptcy discharge voids trial court judgments based upon the

25

personal liability of the debtor."). Because a trial court has the discretion to credit one spouse for certain payments voluntarily made toward marital obligations after the final separation date in order to ensure that marital property is divided justly and reasonably, we cannot say that it would be an abuse of discretion for a trial court to similarly credit one spouse for voluntarily reducing the marital debt through individual bankruptcy. *See Herron v. Herron*, 457 N.E.2d 564, 567-68 (Ind. Ct. App. 1983).

By assuming the consequences of bankruptcy in order to reduce the marital debt, Ibrahim also reduced the possibility of Monica being made responsible for a portion of that debt in the trial court's division of marital property. Yet, Monica now insists that Ibrahim should still be responsible for half of the marital debt listed in her name. If, instead of filing for bankruptcy, Ibrahim had incurred nearly $14,000 of debt during the pendency of the dissolution, there is no question that this debt would be excluded from the marital pot and that Monica would not be obligated to repay any portion of it. Under this same rationale, Monica should not receive a windfall for the marital obligations that Ibrahim satisfied at his sole expense after the final separation date.

In reviewing a trial court's disposition of marital property, we concentrate on "what the court did, not what it could have done." *Bizik v. Bizik*, 753 N.E.2d 762, 766 (Ind. Ct. App. 2001), *trans. denied*. Relying on the final separation date as the controlling factor in the calculation and division of the marital estate, we find no error in the trial court's decision to include Ibrahim's later-discharged marital debts in the marital pot. In its findings, the trial court indicated its intent to effectuate an equal split of the marital property. Because Ibrahim's debt had, in fact, been eliminated by the date of the final

26

hearing, we recognize that the actual net *effect* of the trial court's division resulted in an award to Monica of 48.5% of the marital estate and 51.5% to Ibrahim. Based on the trial court's discretion to credit Ibrahim for reducing the marital debt, we find the trial court acted within its discretion in dividing the marital estate in a just and reasonable manner.

## CONCLUSION

Based on the foregoing, we conclude that (1) the trial court did not abuse its discretion by denying Monica's motion for a change of judge; (2) the trial court did not clearly err in determining that it would be in the Child's best interests to award physical custody to Ibrahim; and (3) the trial court did not abuse its discretion in dividing the marital estate.

Affirmed.

ROBB, J. and BRADFORD, J. concur