## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 17 2017, 8:21 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Darlene R. Seymour
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Walter R. Hagedorn II
Tell City, Indiana

## I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christen Hartsock,<br>*Appellant-Defendant,*<br><br>v.<br><br>Donald Fulkerson,<br>*Appellee-Plaintiff* | February 17, 2017<br><br>Court of Appeals Case No.<br>62A05-1606-JP-1431<br><br>Appeal from the Perry Circuit Court<br><br>The Honorable Lucy Goffinet, Judge<br><br>Trial Court Cause No.<br>62C01-1310-JP-252 |

**Altice, Judge.**

### Case Summary

[1]     Christen Hartsock (Mother) appeals from the trial court's order modifying child custody.  On appeal, Mother argues that the trial court abused its discretion in

awarding Donald Fulkerson (Father) physical custody of the parties' daughter, K.L.F. (Child).

[2] We affirm.

## Facts & Procedural History

[3] Mother gave birth to Child in May 2013. An agreed paternity order was entered on January 3, 2014, at which time Mother was living with Child in Indianapolis and Father was living in Cannelton. Pursuant to the agreed order, Mother and Father shared joint legal custody and Mother was granted primary physical custody. Although Child was less than a year old, Father was granted parenting time in accordance with the Indiana Parenting Time Guidelines for a child three years old and over, although he was not awarded midweek visitation due to the distance between Mother's and Father's homes. Father exercised parenting time on alternating weekends and four nonconsecutive weeks of extended visitation per year.

[4] Father owns a home in Cannelton and has lived there for approximately three years. Father shares the home with his fiancée, Tasha Durcholz, who he has been dating for nearly three years. At the time of the hearing in this matter, Father and Durcholz's wedding was scheduled for October 22, 2016. Father works as a welder and shortly before the hearing, he took a new job making less money so that he could spend more time with Child.

[5]     For most of her life, Child has lived with Mother at Mother's parents' home in Indianapolis. Around Child's first birthday, Mother began dating Kylen Asher, and in 2015, Mother and Child moved into an apartment in Danville with Asher. Mother's relationship with Asher was volatile and included instances of physical violence. Sometimes Asher broke things when he was angry and he once threw a remote control at Mother, causing bruising to her hand. Mother and Asher also sometimes got into verbal altercations in Child's presence, and on one occasion Asher punched Mother's car while Child was inside. Mother nevertheless allowed Asher to be around Child every day and sometimes left Child alone with him. Asher also regularly sent antagonizing and threatening text messages to Father. Despite this, Asher accompanied Mother nearly every time she met with Father to exchange Child for parenting time, and Mother disregarded Father's requests that Asher not be present.

[6]     Mother has had several different jobs during Child's life. She has worked at a restaurant, a retail store, and a gym. For a little over a year prior to the hearing in this case, Mother worked as a propane sales administrator. On August 24, 2015, Mother filed a notice of intent to relocate, in which she indicated she wished to move to Chandler, Arizona with Child to pursue a new job opportunity. The job was with a company run by Asher's stepmother and it would have required Mother to travel on the weekends to work at various trade shows. Mother stated that she had planned to bring Child with her on these trips and for Child—who was two years old at the time—to sit with her in a

booth for approximately eight hours per day. Upon moving to Arizona, Mother intended to live with Asher in a home owned by Asher's parents.

[7] Less than two months after Mother filed her notice of intent to relocate, the job opportunity in Arizona fell through. Shortly thereafter, Mother and Asher broke up following the incident in which Asher punched her car, and Mother and Child moved back in with Mother's parents. Meanwhile, Father had filed an objection to Mother's relocation and a separate petition to modify custody in which he requested physical custody of Child.

[8] A hearing was held on the pending matters on April 11, 2016. At the outset of the hearing, Mother withdrew her notice of intent to relocate, and a hearing proceeded on Father's petition to modify custody. At the conclusion of the hearing, the trial court took the matter under advisement. On May 21, 2016, the trial court entered its order granting Father's petition to modify custody. Father was granted primary physical custody and Mother was granted parenting time pursuant to the Guidelines. It was further ordered that the parties would continue to share joint legal custody. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[9] As an initial matter, we note that the trial court in this case entered special findings of fact and conclusions thereon pursuant to Trial Rule 52(A). Our review of such findings and conclusions is two-tiered. *In re Paternity of D.T.*, 6 N.E.3d 471, 474 (Ind. Ct. App. 2014). First, we consider whether the evidence

supports the findings, and second, whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if they are clearly erroneous—that is, where a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* In conducting our review, we will neither reweigh the evidence nor judge the credibility of witnesses. *Id.* Instead, we will consider only the evidence favorable to the trial court's judgment. *Id.*

[10] Mother argues that the trial court abused its discretion in modifying custody. Our standard of review in such cases is well settled:

> When reviewing a custody determination, we afford the trial court considerable deference as it is the trial court that observes the parties' conduct and demeanor and hears their testimonies. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945-46 (Ind. Ct. App. 2006). We review custody modifications for an abuse of discretion "with a preference for granting latitude and deference to our trial judges in family law matters." *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011) (quoting *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009)), *trans. denied*. We will not reweigh the evidence or judge the credibility of witnesses. *Kondamuri*, 852 N.E.2d at 946. Rather, we will reverse the trial court's custody determination based only upon a trial court's abuse of discretion that is "clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom." *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley*, 247 Ind. 201, 210 N.E.2d 850, 852 (1965)).

*In re Paternity of C.S.*, 964 N.E.2d 879, 883 (Ind. Ct. App. 2012), *trans. denied*.

Pursuant to Ind. Code § 31-14-13-6, a trial court may modify a child custody order only upon a showing that modification is in the child's best interests and that there has been a substantial change in one or more of the factors that the court may consider under I.C. § 31-14-13-2. I.C. § 31-14-13-2 provides that the court "shall consider all relevant factors," including specifically:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parents;
>>
>> (B) the child's siblings; and
>>
>> (C) any other person who may significantly affect the child's best interest.
>
> (5) The child's adjustment to home, school, and community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.
>
> (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Mother argues that the trial court abused its discretion in concluding that there had been a substantial change in circumstances as is required to support the modification of custody. Contrary to Mother's arguments, however, the trial

court's finding of changed circumstances was not based solely on Mother's cohabitation with a significant other or on her changes of residence, nor was it based on a finding that Father could provide a better home. In its order modifying custody, the trial court expressed concerns regarding Mother's judgment when it comes to Child's welfare and Mother's ability to provide a stable environment. A review of the record reveals these concerns to be well-founded.

[13]   Despite having a volatile relationship with Asher, Mother chose to move in with him and to allow him to have unsupervised contact with Child. During the relationship, Asher would sometimes break things when he was angry and he threw a remote at Mother, striking her and causing a bruise. Mother and Asher also had verbal altercations in Child's presence. Additionally, Mother allowed Asher to accompany her to nearly every parenting time exchange, even after Father asked Mother not to bring Asher because Asher had sent threatening and antagonizing text messages to Father. Despite this history, Mother made plans to move Child across the country to live with Asher in a place where Mother had no family and would have been dependent on Asher's family for a job and place to live. Mother's relationship with Asher did not end until after an argument during which Asher punched Mother's car while Child was inside.

[14]   There was also testimony that Mother's older brother, Joshua Foxworthy, had been incarcerated for neglect of a dependent after an incident in which Foxworthy's month-old child sustained a broken arm. At the time of the

hearing in this matter, Foxworthy had recently been released to community corrections, and he had seen Child on three separate occasions while she was in the care of Mother's seventy-two-year-old grandmother, who babysat Child two times per week while Mother worked. Mother was aware of this, but she did not tell her grandmother that Child was not to be around Foxworthy. Although Mother testified that she would not allow Child to be alone with Foxworthy, Mother's mother—who babysat Child three times per week while Mother worked—testified that she saw no problem with allowing Foxworthy to see Child unsupervised because she did not view him as a threat.

[15] The trial court also noted Mother's testimony that if she had gotten the job in Arizona, she would have brought Child with her to trade shows on the weekends and required Child to sit with her in a booth for approximately eight hours per day. Mother also testified that she had taken Child, who was two years old at the time, to a concert at Banker's Life Fieldhouse in Indianapolis, and sat with her in the second row.

[16] With respect to Mother's ability to provide a stable environment for Child, the trial court noted not only Mother's volatile relationship with Asher, but also Mother's move from her parents' home and into an apartment with Asher, and then back into Mother's parents' home, all within a relatively short time period and with Child in tow. But for her relationship with Asher ending and her job opportunity in Arizona falling through, Mother would have moved Child again, this time across the country and away from all family support. Mother also testified that she intended to move again in the near future to a house in

Indianapolis. Mother has also changed jobs a number of times during Child's short life, and although she had held her current job for over a year prior to the hearing in this case, she testified that she would take another job out of state if the pay was better. Mother was unable to name any preschools in the Indianapolis area that she was considering for Child.

[17] Father, on the other hand, owns a home where he has lived continuously since Child was less than a year old. He is a trained welder, and although he had changed jobs shortly before the hearing so that he would be available to spend more time with Child, he did not have a history of frequently changing jobs and he testified that he had no plans to leave his current job any time soon. Father had been dating Durcholz for nearly three years, and they planned to be married in October 2016. Child has a good relationship with Durcholz and Father's extended family. Father has also made arrangements for Child to be cared for while he is at work,[1] and he has selected a preschool and physician for Child and signed her up for swim lessons.

[18] The trial court's findings, which are supported by the evidence, demonstrate that the trial court considered the applicable statutory factors, as well as other relevant factors, to reach its conclusion that there had been a substantial change in circumstances and that a modification of custody was in Child's best interest.

---

[1] Mother's argument that Father should not have been awarded custody because he will rely on Durcholz and his mother to care for Child while he is at work is unpersuasive given that Mother has relied on her mother and grandmother to care for Child while she worked.

We reiterate that trial courts are afforded deference and latitude in family matters, and we will not reweigh the evidence or judge the credibility of witnesses. Mother's appellate arguments are, at bottom, simply a request to substitute our judgment for that of the trial court. As we explained above, however, it is not enough that the evidence might support another conclusion; it must positively require it. Because there is evidence supporting the trial court's findings that there has been a substantial change in circumstances and that modification was in Child's best interests, we must affirm.

[19] Judgment affirmed.

[20] Crone, J., concur.

[21] Riley, J., dissent with opinion.

| | |
|---|---|
| Christen Hartsock,<br>*Appellant-Defendant,*<br><br>v.<br><br>Donald Fulkerson,<br>*Appellee-Plaintiff.* | Court of Appeals Case No.<br>62A05-1606-JP-1431 |

**Riley, Judge dissenting**

I respectfully dissent from the majority's decision to affirm the trial court's order, granting Father physical custody of the parties' minor daughter (Child). In a petition to modify custody, the noncustodial parent bears the burden of overcoming the custodial parent's right to continued custody and must make a showing of a decisive change of conditions in the custodial home or a change in the treatment of the children in the custodial home which necessitates removal. *Swonder v. Swonder*, 642 N.E.2d 1376, 1380 (Ind. Ct. App. 1994). The trial court judge must consider the evidence with the best interest of the children uppermost in his or her mind as the paramount concern. *Id.* It is the effect upon the children which renders any particular change substantial or

inconsequential. *Id.* "[A] change in circumstances must be judged in the context of the whole environment, and the effect on the child is what renders a change substantial or inconsequential. *Jarrell v. Jarrell*, 5 N.E.3d 1186, 1193 (Ind. Ct. App. 2014). We require this strict showing to prevent the disruptive effect of moving children back and forth between parents. *Swonder*, 642 N.E.2d at 1380.

Father, as noncustodial parent, failed this burden of proof. In his petition, filed September 11, 2015, Father claimed that "[c]onditions and circumstances have changed so substantially and continuing in nature that the [provisions of the paternity order] relating to child custody, parenting time and support with respect to the parties' minor child are now unreasonable." (Appellant's App. p. 30). The hearing and Father's appellate brief indicate that Father's strategy[1] focused on three areas: (1) Mother's changes in residence; (2) Mother's unhealthy relationship; and (3) Father has a plan for Child.

[23] The record reflects that for the majority of her life, Child has lived with Mother at the maternal grandparents' residence, except for a brief six-month period—from April 2015 until October 2015—when she and Child lived with Mother's ex-boyfriend. Throughout the proceedings, Mother admitted to a failed, unhealthy relationship with her ex-boyfriend. She testified that she had argued with him on a few occasions, that he had thrown a remote at her and broke her

---

[1] Unlike the majority and the trial court, I will disregard all evidence reflecting on the petition to relocate as Mother withdrew her petition prior to the hearing.

phone. Ultimately, when these verbal arguments became physical and the ex-boyfriend punched Mother's car with the Child inside, Mother ended the relationship. At the time of the hearing, this six-month relationship had been over for almost a year. Father failed to establish that at any point during this relationship, the Child's welfare was in such danger as to warrant a modification of custody. Rather, the Child is bonded with Mother such that she even wants to stay with her during parenting time exchanges.

[24] During the hearing, Father emphasized his own situation believing that he can provide a better home for the Child, indicated that he is involved in a long-term relationship, has steady employment, and has a support system close-by. Although Father claims that he recently changed employment to spend more time with Child, the evidence belies otherwise. Father works evenings from 4:30 p.m. until 2:00 a.m. Monday through Thursday and Fridays from 2:00 p.m. until 10:00 p.m. He is unable to personally pick up the Child for parenting time on Friday evenings and instead, paternal grandmother picks up Child and keeps her until Father gets off work at 10:00 p.m. Based on Father's schedule, Father would be unable to have dinner with Child or put her to bed. Since Father commences work in the afternoon and does not return home until the early hours of the next morning, the Child would be cared for by others and would spend at least two hours at daycare, thereby again reducing the time Father is able to spend with the Child. Even during the weekend, when Father is off work, Father takes Child to the restaurant where his fiancé works so the Child spends time with his fiancé. On the other hand, Mother has been

employed by the same employer for over a year, with a regular 8 to 5 schedule. While Mother is at work, maternal grandmother and great-grandmother watch the Child. Great-grandmother is a retired teacher and works with the Child on educational activities.

[25] Father presented evidence that Mother allowed her half-brother, Joshua, who has been convicted of child neglect, to be around the Child. While Father is correct that Joshua had been present in the house with the Child, great-grandmother was also in the residence. Mother testified that she would not permit Joshua to be alone with the Child.

[26] In its order, the trial court noted that "Father has proven that he is capable of providing the minor child with a loving and stable environment," and that "Father has proven that he will be a responsible parent by researching reputable daycare and school options." (Appellant's App. Vol. II, p. 11). However, a noncustodial parent's improvement in lifestyle is not a basis for modification. *See Joe v. Lebow*, 670 N.E.2d 9, 19 (Ind. Ct. App. 1996).

[27] Rather than establishing specific evidence of a substantial change warranting a modification of the Child's custody, Father presented general statements picking apart Mother's life choices while focusing on self-serving statements bolstering his argument that he is the better parent. A single decision made by a young mother, as well as her mature admission of the unhealthy relationship and consequential break-up, are merely reflective of a young person trying to grow up. Isolated acts of a custodial parent do not warrant modification of

custody. *Simons v. Simons*, 566 N.E.2d 551, 555 (Ind. Ct. App. 1991). While I agree that some changes have occurred in the lives of both Father and Mother, none of these are substantial to warrant the uprooting of a very young child. As Father did not carry his burden of proof and all reasonable inferences drawn from the evidence lead to a conclusion other than that reached by the trial court, I would reverse the trial court's modification of custody.

[28]