## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 30 2019, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas J. Gaunt
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Paternity of A.H., Minor Child, | September 30, 2019 |
| D.H., | Court of Appeals Case No. 19A-JP-442 |
| *Appellant,* | Appeal from the Johnson Circuit Court |
| v. | The Honorable Michael T. Bohn, Judge |
| K.M., | The Honorable Andrew S. Roesener, Judge |
| *Appellee.* | Trial Court Cause No. 41C01-1703-JP-44 |

**Brown, Judge.**

[1] D.H. ("Father") appeals from the order of the trial court regarding the custody of A.H. Father raises one issue which we revise and restate as whether the court erred in granting joint physical custody and in granting K.M. ("Mother") legal custody. We affirm.

*Facts and Procedural History*

[2] Father and Mother began dating in November 2015. In January 2016, Mother learned she was pregnant. In February 2016, Father and Mother moved in together at the house of Father's grandmother. Mother gave birth to A.H. on August 31, 2016. In December 2016, Mother told Father they were no longer a couple, but they continued to cohabitate.

[3] On March 14, 2017, Mother took A.H. to Dr. Christina Fox for a wellness visit. The report of Dr. Fox's progress notes states: "Current concerns at this visit include concern that bruises on [A.H.] came from [Father who] said it was from her toy but [Mother does not] believe it . . . ." Petitioner's Exhibit C (some capitalization omitted). The report also states: "Circular bruise on left cheek with some pooling toward the mouth. 'pinch' style bruise on left arm just above elbow, fainter bruising on right back by hip." *Id.* Later that month, Mother moved to Michigan with A.H. On March 23, 2017, Father filed a petition to establish paternity of A.H.

[4] An Assessment of Alleged Child Abuse or Neglect by the Indiana Department of Child Services ("DCS") dated June 2017 indicated that Michigan Child

Protective Services made an unannounced visit to Mother's home on March 27, 2017, as a courtesy for DCS and observed the home to be appropriate and did not note any new bruising. The assessment also contained the following concluding statement:

> Physical abuse, specifically bruises/cuts/welts and child neglect, specifically environmental life/health endangering are substantiated against [Father] and [Mother] as to [A.H.]. [Father] maintains that he was there with [A.H.] when she got the bruise on her cheek, however his explanation for the bruise is not consistent with the bruising. [A.H.] spent most of the time prior to the other bruises with [Mother], giving her the most opportunity to cause the injuries. With both parents stating that they felt that there were concerns for the other prior to the assessment, they have both exposed the child to unsafe conditions in the home.

Petitioner's Exhibit D.

[5] On June 22, 2017, the court held a hearing at which it indicated that the orders it would issue that day were going to be temporary in nature except for the issue of paternity. After hearing from Father and Mother, the court stated: "I'm going to leave primary physical and sole legal custody with [Mother] for now. This is going to be very difficult moving forward. Just because I'm doing this today doesn't mean I'm not going to give [Father] physical custody ultimately." Transcript Volume II at 16. The court stated: "I don't know that this is perfect, but the fairest way I can think to do it is like every third week [Father] gets a week of time with [A.H.]." *Id.* The court ordered the parties to participate in

mediation and that Mother "provisionally has primary physical and sole legal."
*Id.* at 20.

[6] On July 11, 2017, the court entered an order establishing Father as the legal and biological father of A.H. and ordering that Mother have primary physical custody and sole legal custody. The court also ordered that Father have parenting time as follows: "One week long visit on the third (3rd) week of each month. Father's first visit shall commence July 2, 2017 at 12:00 p.m. and concluding July 9, 2017 at 12:00 p.m." Appellant's Appendix Volume II at 71.

[7] On October 12, 2017, the court held a status conference. In support of her motion for change of venue, Mother stated that she lived in Michigan, went to her mother's home where she grew up, and had a life established with school and playdates for A.H. The court denied her request for change of venue.

[8] On November 2, 2017, Mother petitioned for a personal protection order against Father in a Michigan trial court, and the court denied the petition on November 30, 2017.

[9] On April 9, 2018, Guardian ad Litem Andrew Woods ("GAL Woods") filed a report which stated the following under the heading summary and recommendation:

> This is a difficult case. I have concerns about the issue of bruising on [A.H.]. Both Dr. Fox and Dr. Thompson observed bruising on [A.H.]. Dr. Thompson's report clearly identifies the bruising as non-accidental. Further, Dr. Thompson opines that [A.H.] is at high risk for continued injury without intervention of

some sort. The DCS investigation consisted of interviews with both parents, review of the medical records and the involvement of the Greenwood Police Department. Neglect/abuse was substantiated against both parents. A CHINS case was not filed.

Both parents point to the other as the culprit. Father believes that Mother inflicted the injuries in part to give her an excuse to leave Indiana and move to Michigan. Mother describes a pattern of inappropriate and rough parenting by Father to support her contention that he caused the injuries. The authorities involved apparently didn't have enough evidence to move forward. What is left are a number of questions without answers. Each parent provided conflicting stories buttressed by witness accounts. Each parent did their best to convince me that the other was at fault. In the end, I can't render an opinion one way or the other based upon the information provided.

I'm troubled by Mother's sudden departure. She left Indiana abruptly relating that it was to get away from [Father] and the bruising he caused to [A.H.]. However, by all accounts Mother left [A.H.] alone with Father for periods of time prior to her move to Michigan. If Father caused the injuries to [A.H.], leaving him alone with her was a lapse in judgment on Mother's part. I have no doubt the parties' relationship was troubled. They strike me as quite different people. However, Mother made a choice to leave the state and then did not allow Father access to [A.H.] for a long period of time. Mother's attempt to file a protective order in Michigan belies [sic] her efforts to keep Father from having a relationship with [A.H.]. Mother mentioned that the move was in part to escape [Father], but she seems to have little appreciation for how that distance would impact Father's ability to parent [A.H.].

Mother has lived in Michigan for over a year. She has done little to stabilize a life for [A.H.] by obtaining full-time employment and a permanent home outside of maternal grandmother's residence. While not critical of co-habitation with extended family members, I'm worried for [A.H.] that Mother has failed to

demonstrate an ability to support and maintain a home that provides permanency for [A.H.].

Father is not without his flaws. I tend to agree with Jessica[] Powers['s] description of Father as having an "intense personality." He persisted to text Mother on a daily basis asking about [A.H.'s] welfare after Mother asked him to stop. Mother's friends at Pets Smart [sic] both noted Father's demeanor in an unfavorable manner which, in part, supports Mother's complaints that Father was controlling and authoritative in their relationship. Many of Father's text messages to Mother were critical of the manner in which she addressed or failed to address [A.H.'s] medical issues. I have concerns that if awarded primary custody of [A.H.] he will discount input by Mother.

Father demonstrates more stability than does Mother. He has a full-time job he appears to enjoy. He has a goal to someday manage the department where he works. He has his own home and maintains this household. Father is organized and presents a plan for [A.H.] if she were to live with him on a more permanent basis.

[A.H.] is clearly loved by both parents. Presently [A.H.] travels approximately 8 hours twice a month so she can spend time with Father. This is troublesome. It's a long drive for such a young child, with no clear solution other than awarding one parent custody with the other parent having diminished time with their daughter. The Court can maintain the current arrangement, but . . . a more definitive decision will need to be rendered once [A.H.] starts school.

Ideally, if distance weren't such a factor, I'd recommend a shared parenting model with the parties utilizing a co-parenting app to assist in resolution of disputes. However, that is not the reality of the current situation. This is such a close call, I'm reluctant to recommend either parent as a distinct candidate for primary physical custody. They both have their strengths and weaknesses. Based upon the information available if I were

forced to choose, I think Father can provide a more stable and structured home for [A.H.] at this point. This recommendation is tempered. If Father demonstrates behavior that proves alienating of Mother's relationship with [A.H.], then the issue of physical custody should be reviewed. While I empathize with Mother's departure and understand her reasoning for the same, it was rash and without forethought.

GAL Exhibit 1.

[10] On January 4, 2019, the court held a hearing. Father appeared with counsel, and Mother appeared *pro se*. The court stated: "So we are set for basically final hearing on that provisional order." Transcript Volume II at 43. Mother objected to the admission of the GAL's report on hearsay grounds and because she disagreed with the outcome. The court admitted the report over Mother's objection.

[11] Father testified that he worked at Costco Wholesale as a tire installer and part-time supervisor, graduated from Greenwood Community High School, lived in Greenwood, and exercised parenting time since the matter was commenced. He testified that the distance between his residence and Mother's residence was about 470 miles and it took about eight and one-half hours "[f]rom door to door." *Id.* at 47.

[12] He testified that Mother said something on March 10, 2017, about being extremely angry. He stated that A.H. fell over two days later and hit her face on an activity cube toy resulting in a small bruise on her cheek, that Mother took A.H. to a doctor on March 14th for a wellness visit, and that he discovered

CPS paperwork, the doctor's report, and domestic violence paperwork in the diaper bag later that day. He stated that, when he left for work that morning, A.H. had one bruise on her cheek from when she fell and that she had five bruises by the time he found the paperwork. He also detailed his difficulties in using Skype to communicate with A.H. when she was with Mother. He testified that A.H. had twenty-six yeast infections since parenting time began, that he thought there was a continuing problem with diapering and cleanliness of A.H., and that he brought the yeast infections to a doctor's attention ten to fifteen times. When asked if there was ever an occasion where he saw A.H. injured or harmed by Mother as a result of her carelessness or negligence, he answered: "That I witnessed? No." *Id.* at 75. Father testified that there was plenty of risk of harm and stated: "Leaving [A.H.] unbuckled in car seats while, you know, sitting in a place, or leaving her unbuckled in a swing, leaving her unbuckled in her bouncing chair, an infant bouncing chair, which is one that they're laying in, so they bounce up and down in." *Id.* at 76. He denied ever shaking A.H. or muffling her crying. He stated that Mother informed him on March 21st that she was moving to Michigan with A.H. the following day and that he filed a petition for custody two days later. He testified that he rents his home in Greenwood and intends to become a homeowner. He indicated he had concerns about Mother including forgetting to provide A.H. medications or change her diaper and "just kind of benign neglect." *Id.* at 57.

[13]    Father's sister testified that she watched A.H. five days a week when Mother and Father were living together and that she would be available to help care for

A.H. if Father was awarded custody. She testified that she observed a few occasions when Mother was unsafe with A.H. such as when A.H. was not buckled into her swing. She stated that Mother told her that she forgot to buckle A.H. into her car seat and when they arrived home A.H. "flipped out of the car seat" and landed on the concrete porch. *Id.* at 92. She testified that she never heard Mother say that she was afraid of Father's care. She also stated that she did not think Mother changed A.H.'s diaper as frequently as she should have. On cross-examination, she indicated that she remembered offering her house to Mother "for refuge if anything happened at [Mother's] home." *Id.* at 98. On redirect examination, she stated that she made the offer when Mother and Father "weren't getting along." *Id.* at 99.

[14] Jonathan Goens testified that he worked with Mother at PetSmart for some time and became friends with Father. He stated that there had been times where Mother seemed distracted and that Father usually cared for A.H. Marcus Guido testified that he was in a romantic relationship with Mother for approximately a year and that Mother blindsided him on the temple on one occasion. He also stated that Mother "made the comment that raising a child is no different than raising a dog, trying to make the comparison with raising a child to that of an animal needing food and needing water, needing to go outside to go to the bathroom, the basic needs of a dog or a cat." *Id.* at 112. On cross-examination, he denied that his cheating on Mother ended their relationship and when asked, "You don't remember kneeling then and begging me to punch you," he answered: "No, I really don't." *Id.* at 114.

Jennifer Dresslar, Father's friend, testified that Father was a great dad and that she went with him to pick up A.H. on occasions and observed that A.H. had dirt underneath her nails, smelled bad, wore dirty clothes, and had a yeast infection almost every time they picked her up. She stated that Mother was always pleasant but seemed to ignore Father when he wanted to bring things to her attention.

Mother testified that she just started a business, A.H. was in school, she and A.H. have their own apartment, A.H. has a play group on Thursdays, she is with A.H. every night, and A.H. has a very reliable daycare center, a dentist, and a primary physician. She stated that Father sent a text message which stated: "I think you'd be a great mom. Believe me, out of the two of us, I'm the one who shouldn't be a parent." *Id.* at 127. She stated: "I do believe that me having full custody is in her best interests, and I pray the Court has that interest as well." *Id.* at 128. On cross-examination, she acknowledged that there was one occasion when A.H. fell onto pavement because she forgot to buckle her into her car seat.

On February 1, 2019, the court entered an order awarding Mother and Father joint physical custody and appointing Mother as the sole legal custodian. The order states:

## FINDINGS OF FACT

* * * * *

14. Since the provisional order was established, Father has regularly exercised his court ordered parenting time.

15. Mother currently resides in Lincoln, Michigan. Lincoln is approximately 470 miles from Father's home in Indiana and it takes around 8 hours to travel from Father's home to Mother's home.

16. The parties have used a half-way point to meet for the exchange of [A.H.].

* * * * *

19. [A.H.] is set to start pre-school in April of 2020.

20. Father was ordered to pay thirty dollars ($30.00) per week pursuant to the Court's July 11, 2017 Order Establishing Paternity and Provisional Orders Concerning Custody, Parenting Time and Child support.

21. Father is currently employed at Costco as an installer and part time supervisor. Father's weekly income is $590 per week.

22. Mother is currently self-employed. She has recently started her own pet grooming service. Mother's weekly income through her new business is approximately $233.00 per week.

23. The Court finds that Mother is capable of full-time employment and imputes $290.00 per week in income for purposes of a child support calculation.

24. Mother currently pays $100 per week for work-related child care expenses. Father currently pays $45 per week for work-related child care expenses.

25. Father filed three separate contempt petitions against Mother alleging that she 1) failed to follow the procedures in I.C. 31-17-2.2-1(b)(4) and (5) with respect to a relocation; 2) failed to allow Father an opportunity for additional parenting time pursuant to

the provisions of the Indiana Parenting Time Guidelines; and 3) failed to allow reasonable visitation via Skype.

26. The "Third Motion to Amend Contempt" also sought relief from Mother's habitual non-compliance with pick-up/drop-off times.

## CONCLUSIONS OF LAW

\* \* \* \* \*

6. The Court gives great weight to the report and recommendations of the GAL. Specifically, the GAL's recommendation for a shared parenting model if distance were not a factor.

7. Additionally, the GAL correctly noted that since [A.H.] is not currently in school, the Court can maximize the parenting time of each parent before needing to make a more permanent decision on physical custody.

8. The current parenting schedule has Mother exercising two weeks of parenting time followed by one week of parenting time for Father.

9. It is apparent that both Father and Mother love [A.H.] and seek to have primary physical custody of her.

10. The Court finds that it is in [A.H.'s] best interest to for [sic] the parents to share physical custody of the child. The parenting schedule shall be modified to allow each parent two consecutive weeks of parenting time.

11. The Court takes into consideration the GAL's concerns with the distance between the parties in making this parenting time determination. The Court finds that a weekly car trip of approximately eight hours would not be in the child's best interest.

12. However, the Court understands that given the age of [A.H.], and that she has bonded with both parents, it is important that she maintain regular weekly contact with each parent while in the custody of the other.

13. The parties have attempted to utilize parenting time via Skype with limited success. The major problem after reviewing the exhibits introduced into evidence, from the Court's perspective, is lack of a definite day and time for the Skype sessions to take place.

14. The Court orders the parties participate in Skype parenting time on each and every Tuesday and Thursday at 7:30 p.m. for a period of fifteen (15) minutes.

* * * * *

16. It is apparent from the communications entered into evidence through the various exhibits that the parents are not willing and able to communicate in advancing the child's welfare as contemplated in I.C. 31-14-13-2.3(c).

17. Additionally, the parents live approximately eight hours apart making everyday communications regarding issues . . . related to school, religion, and medical decisions more difficult.

18. Leading up to the final hearing, Mother has exercised primary legal custody of [A.H.].

19. Father has taken initiative in having [A.H.] seen by her pediatrician in Indiana and has sought medical treatment for the reoccurring yeast infections suffered by [A.H.].

20. Mother has sought medical treatment for [A.H.] in Michigan and has taken the steps to have her enrolled in pre-school.

21. The Court does not find the parents to be suitable individuals to share joint legal custody of [A.H.] given the difficulty in communication between the parties and the distance between their respective residences.

22. The Court awards Mother sole legal custody of [A.H.].

* * * * *

24. Based on the evidence presented at trial, the Court does not find that Mother has willfully violated the prior orders of this Court as alleged by Father.

25. The Parties are admonished that they should make great efforts to arrive on time for all future parenting time exchanges.

26. The Court finds that the GAL recommendation of a co-parenting application would greatly assist the Court and parties in [] future contempt issues regarding parenting time.

## JUDGMENT

1. Mother and Father are awarded joint physical custody of the minor child. Each parent shall enjoy two continuous weeks of parenting time with the pick-up/drop-offs to occur on Saturdays at the half-way point previously decided on by the parties.

2. Father's first full two weeks of parenting time shall occur on his first visit after the issuance of this order.

3. The parties are ordered to allow Skype parenting time to occur each and every Tuesday and Thursday at 7:30 p.m. for a period of at least fifteen (15) minutes unless otherwise modified by agreement.

4. Mother shall be the sole legal custodian of [A.H.].

5. Father is ordered to continue to pay $30 per week in child support. Based on the figures presented, the Court does not find a 20% deviation to allow for a child support modification. (For purposes of calculating the child support obligation, the Court reduced the weekly work-related child care expense paid by each parent by one-half since the child is in the other parent's care for one-half of the year.)

6. Weekly support payments (and the annual child support administrative fees as required by the Indiana Code) shall be paid by Father . . . .

7. The parties shall split the uninsured medical expenses with Father paying sixty-seven percent (67%) and Mother paying thirty-three percent (33%) of all uninsured medical, dental, orthodontic, ophthalmologist, and pharmalogical expenses.

8. Father shall claim the minor child as a dependent for state and federal tax purposes commencing in 2019 (for taxes paid during calendar year 2018) and each even numbered year thereafter. Mother shall claim the child in all odd numbered years.

\* \* \* \* \*

9. The parties are ordered to use OurFamilyWizard.com, or an alternate parenting app agreed upon by the parties, for all communications regarding the scheduling and implementation of parenting time.

Appellant's Appendix Volume III at 94-103.

## *Discussion*

[18] Before addressing Father's arguments, we note that Mother did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing arguments, and we apply a less stringent standard of review, that is, we may reverse if the appellant establishes prima facie error. *Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006). This rule was established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. *Wright v. Wright*, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002).

[19]     The issue is whether the trial court erred in granting joint physical custody and in granting Mother legal custody. Father asserts that he provided extensive testimony about his love and care for A.H. and his employment. He also points to the testimony of his witnesses and the GAL report. He asserts that Mother's income of $232 on her child support worksheet is not well-founded. He contends that he is cooperative, generated the initiative in Skyping, and attempts to reschedule Mother's missed Skype appointments.

[20]     A trial court's findings control as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). When a trial court has made findings of fact, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. *Id.* Findings will be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.* A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[21]     A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945-946 (Ind.

Ct. App. 2006). Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses, or substitute our judgment for that of the trial court. *Id.* at 946. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. *Id.*

[22] The standard for an initial custody determination is set forth in Ind. Code § 31-14-13-2, which provides:

> The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parents;
>>
>> (B) the child's siblings; and
>>
>> (C) any other person who may significantly affect the child's best interest.
>
> (5) The child's adjustment to home, school, and community.
>
> (6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

[23] The record reveals that GAL Woods indicated that he would recommend a shared parenting model if distance were not a factor. While his report stated that if he "were forced to choose" he thought Father could provide a more stable and structured home, it also stated that "[t]his recommendation is tempered," that this case is such a close call he was reluctant to recommend either parent as a distinct candidate for primary physical custody, both parents have their strengths and weaknesses, he had concerns if Father were awarded primary custody that he would discount input by Mother, and that it was a difficult case. GAL Exhibit 1. The Assessment of Alleged Child Abuse or Neglect dated June 2017 indicated that Michigan Child Protective Services observed that A.H. did not have any new bruising during an unannounced visit. The court was able to hear the witnesses including Mother's testimony that she had started a business, A.H. was in school, she and A.H. had their own apartment, and A.H. had a very reliable daycare center, a dentist, and a primary physician. Based upon the evidence as set forth above and in the record, we conclude that the trial court's findings and conclusions are not

clearly erroneous and that the court did not err in granting joint physical custody to Mother and Father and in granting Mother legal custody.[1]

[24] For the foregoing reasons, we affirm the judgment of the trial court.

[25] Affirmed.

Altice, J., and Tavitas, J., concur.

---

[1] To the extent Father asserts that Mother's income of $232 on her child support worksheet is not well-founded, we note that the trial court used a weekly gross income amount of $290 for Mother in calculating his support obligation.